**Scott McLAUGHLIN, as a Candidate for Governor of North Carolina and as a representative of the Libertarian Party of North Carolina, Plaintiff,**

**Libertarian Party of North Carolina, Plaintiff,**

**Libertarian Party, The Plaintiff,**

**Kathleen Ferrell, as a North Carolina Voter who desires to remain registered as a Libertarian, Plaintiff,**

**v.**

**NORTH CAROLINA BOARD OF ELECTIONS, Defendant,**

**William A. Marsh, Jr., in his official capacity as acting Director of the State Board of Elections Defendant.**

**No. 2:93CV00100.**

United States District Court, M.D. North Carolina, Greensboro Division.

April 19, 1994.

Ernest Clarke Dummit, American Law Offices, P.A., Winston–Salem, NC, for plaintiffs.

Charles M. Hensey, N.C. Dept. of Justice, Raleigh, NC, for defendants.

### ORDER

ERWIN, Senior District Judge.

On February 25, 1994, the Recommendation of the United States Magistrate Judge was filed and notice was served on the parties pursuant to 28 U.S.C. § 636. Thereafter, the Court received plaintiffs' objections to the Recommendation of the United States Magistrate Judge.

 The Court has appropriately reviewed plaintiffs' objections de novo and finds they do not change the substance of the United States Magistrate Judge's rulings which are affirmed and adopted.

**NOW, THEREFORE,** pursuant to the Recommendation of the United States Magistrate Judge, it is **ORDERED** that plaintiffs' and defendants' motions for summary judgment are granted in part and denied in part and that all plaintiffs' claims are dismissed except that as to Count II of the Complaint and plaintiffs' Prayer for Relief, it is declared that those parts of North Carolina General Statute § 163–96(b) which provide:

The validity of the signatures on the petitions shall be proved in accordance with one of the following alternative procedures:

(1) The signers may acknowledge their signatures before an officer authorized to take acknowledgments, after which that officer shall certify the validity of the signatures by appropriate notation attached to the petition, or

(2) A person in whose presence a petition was signed may go before an officer authorized to take acknowledgments and, after being sworn, testify to the genuineness of the signatures on the petition, after which the officer before whom he has testified shall certify his testimony by appropriate notation attached to the petition[,]

and the further requirement that the county board of elections "shall require a fee of five cents (5¢) for each signature appearing" on the petitions are unconstitutional as Chapter 163 of the North Carolina General Statutes is presently constituted and, therefore, pursuant to Fed.R.Civ.P. 65 that the defendants, their officers, and agents are enjoined from utilizing, requesting compliance with or enforcing the same.

Feb. 25, 1994.

### FINDINGS OF UNITED STATES MAGISTRATE JUDGE

ELIASON, United States Magistrate Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. The Court heard oral argument on February 3, 1994. Previously, the parties submitted stipulated facts (pleading 9) along with exhibits. At the oral argument, both sides agreed that the Court could consider all forty-four exhibits in support of the stipulated facts, including unsigned affidavits which were to be treated as if they were signed by the affiants. In addition, both parties stated that should the matter be submitted for trial, they would have no further evidence to submit in support of their claims or defenses. Considering the nature of these stipulations, the Court finds the matter is appropriate for decision on the present record.

Plaintiffs are the Libertarian Party of North Carolina, the Libertarian Party (the national party), a former Libertarian candidate for governor and representative of the Libertarian Party, and a registered Libertarian voter. The defendants are the North Carolina Board of Elections and its director.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201. Plaintiffs seek injunctive and declaratory relief, pursuant to 42 U.S.C. § 1983 and the above statutes, against N.C.Gen.Stat. §§ 163–96(b), 163–97 and 163–97.1, claiming that both on their face and as applied, the statutes violate the First and Fourteenth Amendments of the United States Constitution. The plaintiff Libertarian voter claims that her First and Fourteenth Amendment rights are violated because the state arbitrarily denies her the

right to register as a Libertarian. Finally, plaintiffs claim that as a result of the totality of the operation of the challenged statutes and certain election improprieties occurring during the 1992 general election, plaintiffs are entitled to injunctive relief.

## I.

### Summary of Stipulated Facts and Evidence Parties

1. The Libertarian Party is a national political party which has a nationally published political platform, regularly holds state and national conventions, has supported the successful candidacies of elected officials and has been certified as a "political party" in North Carolina.

2. Plaintiff Scott McLaughlin resides in Guilford County, North Carolina; was the Libertarian Party's candidate for governor in the general election held on November 3, 1992; is a member at large of the Executive Committee of the Libertarian Party of North Carolina and brings this action in both capacities and on behalf of the Libertarian Party.

3. Plaintiff Kathleen Ferrell is a citizen, resident and registered voter of Guilford County, North Carolina. She registered to be a member of the Libertarian Party after the 1992 general election and desires to remain registered as a Libertarian with the Guilford County Board of Elections.

4. The North Carolina State Board of Elections (hereinafter "Board") is an agency of the State of North Carolina empowered to act for the State of North Carolina by N.C.Gen.Stat. §§ 163–19–22. Defendant Board is responsible for the overall supervision of elections, maintenance of records of elections and supervision of the county boards of elections in regard to maintenance of records of registered voters in North Carolina.

### 1976 and 1980 Elections

5. The Libertarian Party of North Carolina was formed in 1976 and has participated in most general elections since its formation. At that time, N.C.Gen.Stat. § 163–96 required a new political party to obtain 10,-000 signatures on a petition in order to be recognized and gain access to the ballot.

6. The Libertarian Party participated in the 1976 election for president, along with two other minor parties, the American Party and the Labor Party, and with the two dominant or major parties, the Democratic and Republican Parties. The total vote for president in North Carolina was 1,677,906. The Libertarian candidate received 2,219 votes, the Labor Party 755 votes, and the American Party 5,607 votes.

7. The Libertarian Party participated in the 1980 presidential election. The total presidential vote was 1,855,896. The minor parties were the Libertarian Party, the Citizens Party, and the Socialist Workers Party which received 9,677 votes, 2,287 votes and 416 votes, respectively. In addition, independent candidate John B. Anderson received 52,800 votes.

### 1984 and 1986 Elections

8. Prior to the 1984 election, N.C.Gen. Stat. § 163–96(a)(2) was amended to increase the number of signatures required on a petition to two percent (2%) of the number of persons who voted in the most recent general election for governor in order for a new political party to be recognized and gain access to the ballot. If the party does not obtain ten percent (10%) of the vote for governor or president, it loses recognition. N.C.Gen.Stat. §§ 163–96 and –97.

9. The Republican and Democratic Parties are the only two parties who have remained Certified Political Parties under N.C.Gen.Stat. §§ 163–96 and –97 since their enactment.

10. In the 1984 election the Libertarian and Socialist Workers Parties fulfilled the two percent (2%) petition requirement and appeared on the ballot. The vote for the presidential electors was 2,175,361 and the total votes cast for governor was 2,226,727. The Libertarian candidate for president obtained 3,794 votes and their candidate for governor received 4,611 votes. This amount fell far short of the ten percent (10%) of either the gubernatorial or presidential elector votes needed to remain qualified as a

political party under North Carolina law and N.C.Gen.Stat. § 163–97.1 was implemented.

11. In the 1988 general election, the Libertarian Party did not qualify as a political party under the two percent (2%) petition requirement of N.C.Gen.Stat. § 163–96(a)(2). The New Alliance Party did. The Libertarian Party, however, did qualify to have write-in votes cast on its behalf counted pursuant to N.C.Gen.Stat. § 163–123. The total presidential vote was 2,134,370. The total vote for governor was 2,180,025. In the presidential vote, the New Alliance Party obtained 5,682 votes and the Libertarian Party write-in candidate received 1,263 votes.

### 1992 Libertarian Party Ballot Access

12. North Carolina General Statute § 163–96(b) requires that any petitions filed with the State Board of Elections first be presented to and examined by the chairman of the county board of elections of the county in which the signatures were obtained. The chairman of the county board of elections (or the chairman's designee) must examine each signature on the petition; determine that the signatory is qualified and registered to vote; place a check mark by the name of each person found to be qualified; collect a sum of money equal to a charge of five cents per name for each name appearing on the petitions presented; attach a certificate to the petition stating the signatures have been checked; indicate the number of qualified signatories in the certificate and return the certified petitions to the person who presented them.

13. The petitions may be presented at any time to the chairman of a local board of elections but the statute sets a deadline of 5:00 p.m. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections in which the new party desires to participate. The verification process must be completed within two weeks from the date a petition is presented and the required fee paid. The deadline for submission for the 1992 general election was May 15, 1992.

14. North Carolina General Statute § 163–96(a)(2) requires all petitions certified by county boards of elections to be filed with the State Board of Elections by 12:00 noon on June 1 of the year preceding the first general election in which the new party desires to participate. The deadline for the 1992 general election was 12:00 noon, June 1, 1992.

15. In order to satisfy the petition requirement of N.C.Gen.Stat. § 163–96 for the 1992 election, the Libertarian Party in North Carolina was required to obtain verified 43,600 signatures. By October of 1991, it had obtained over 64,000 signatures. However, after submission of the signatures on the petitions to the various county boards, only 37,601 signatures were validated. Libertarian Party officials discovered a suspiciously high rejection rate in the three most populated counties (Wake, Mecklenberg and Forsyth) which declared over one-half of the signatures invalid. However, in the remaining 97 counties, the validation rate was approximately sixty-seven percent (67%).

16. Lynn Michael Fogwell, Chairman of the Libertarian Party, discovered that approximately ten percent (10%) of the Wake County Board of Elections signatures declared invalid were actually valid. Three thousand seven hundred eighty-eight (3,788) signatures were resubmitted. Four hundred twenty-four (424) were eventually validated. Nevertheless, the party was required to pay another five cent validation fee even with respect to those signatures previously rejected but now found valid. This produced an additional cost of $189.40.

17. Through similar revalidation, the Libertarian Party achieved the necessary signatures to qualify as a political party pursuant to N.C.Gen.Stat. § 163–96(a)(2) and to have the names of its candidates appear on the ballot for the 1992 general election. The party was required to pay over $3,200.00 for the validation and revalidation process.

18. In addition to the five cent signature validation fee, the validation process also involves expenses of paying for signature collection and notarization fees. Petitions for political parties require that either the signer of the petition or the person who witnesses the signature, i.e. the petition collector, appear before a notary public or other oath-

taker and declare the signatures to be genuine. The parties stipulated at oral argument that the notarization requirement presented a not insignificant burden in the overall petition process. Petitions for other candidates are not subject to the notarization requirement.

19. Not all states have the same ballot access requirements. For example, in South Carolina a political party need only obtain 10,000 signatures to be certified.

20. The Libertarian Party was certified as a new political party on May 20, 1992. On June 12, 1992, the State Board of Elections certified the list of Republican and Democratic Parties' nominees in the primary elections. On June 18, 1992, it sent this list to the county boards of elections and also notified the local boards of the Libertarian Party's status as a newly recognized political party and that voters could now affiliate with the party. Pursuant to N.C.Gen.Stat. § 163–98, the Libertarian Party was required to select its candidates by a party convention and certify the names to the State Board of Elections on or before July 1, 1992.

21. The Libertarian Party held its state convention on June 27, 1992 and nominated plaintiff McLaughlin for governor and candidates for other offices. The list of candidates was timely certified. The certified list of candidates sent by the Board to the Secretary of State and county boards of elections was identical to the certified list submitted by the Libertarian Party. A change in the designation of one of the candidate's State House district was duly recorded. In August, a Libertarian Party senatorial candidate requested a correction in the spelling of his name which was accomplished.

22. The State Senatorial District #28 comprises all of Yancey, Madison and McDowell counties and portions of Buncombe and Burke counties. The Libertarian Party candidate for that district was left off the ballot in two of the counties. The omission was brought to the attention of the Burke County Board. On October 6, 1992 the candidate was shown two corrected versions of the ballot. Neither of these were in the same pattern as the remainder of the ballot. The candidate was required to select from one of the two versions wherein his name was separated from the other two candidates by a horizontal line. Corrected ballots were prepared. The candidate's name was also omitted on the McDowell County ballot. In both situations, they were reprinted before the general election and all absentee or one-stop voters were given an opportunity to correct their vote.

### Plaintiffs' Registration Efforts

23. From 1988 to 1992, registered voters in North Carolina increased from approximately 3,400,000 to 3,800,000. Persons not registering as either Democrat or Republican increased from approximately 168,000 to 287,000.

24. The Libertarian Party uses voter registration records to help target the party's campaign support efforts as well as promote additional voter support.

25. Registration books closed for the 1992 general election on October 5, 1992. By this time, 677 person registered as members of the Libertarian Party.

26. Prior to the close of registration for the 1992 election, the Libertarian Party experienced five incidents of registration difficulty.

a. On August 17, 1992, at a rock concert, the Democratic Party was registering voters. The registrar had not been notified that the Libertarians were a recognized party and she would not register persons as Libertarians until a registered Libertarian party member showed her the registration card with the Libertarian Party name on it.

b. On August 20, 1992, an individual was told by a special registration commissioner at the Watson–Matthews office in Carteret County that she could only register as Democratic, Republican or unaffiliated.

c. On September 30, 1992, in Forsyth County, a voter was only offered the choices of Democrat, Republican or Independent for party affiliation.

d. At an undetermined time, a registrar in Rowan County was not aware that a person could register as a Libertarian. When a voter's husband produced his Libertarian

registration card, his spouse was allowed to likewise so register.

e. At another undetermined time, in Stanly County, a person trained to act as a special registration commissioner was never given any information about the new status Libertarian Party.

### Actions Taken by the Secretary of State and/or Local Boards of Elections

27. On September 23, 1992, the Publications Division of the Department of the Secretary of state compiled and issued a publication entitled "1992 Candidates List." The first part of the publication listed only candidates for the Democratic and Republican parties. Candidates for the Libertarian Party, Write-in and Unaffiliated Candidates were listed in the back in Addendum A.

28. The Rowan County Board of Elections published and distributed a pamphlet entitled "Rowan Voter Guide." The portion of the pamphlet under the heading "Party affiliation" read: "When you register, you will be asked to declare your party affiliation. You may register in one of the following ways: *Democrat *Republican *Unaffiliated."

29. The Person County Board of Elections published and distributed a pamphlet entitled "Person County Voter Guide." The portion of the pamphlet under the heading "Party Affiliation" read: "When you register you will be asked to declare your party affiliation. You may register in one of the following ways: .Democrat. .Republican. .Unaffiliated."

30. The Election Boards Association of North Carolina published and distributed a pamphlet entitled "Voting in North Carolina." The portion of the pamphlet under the heading "Do I have to register party affiliation?" read: "In North Carolina there are two recognized political parties, but the voter has the option to register Unaffiliated."

31. The Wake County Board of Elections published and distributed a pamphlet entitled "Voter Guide for Wake County." The portion of the pamphlet under the heading "Party Affiliation" read:

When you register, you will be asked to declare your party affiliation. You may register with any recognized party in the State of North Carolina. Party affiliation determines the primary in which a voter is eligible to vote. You may also register unaffiliated. During a partisan primary election, an unaffiliated voter may vote only in a party primary that authorizes unaffiliated votes.

32. An employee of the Buncombe County Board of Elections, in response to a telephone inquiry where the caller did not reveal his name, when asked about candidates in races where there was a Libertarian Party candidate, gave the names of Democratic and Republican Party candidates but did not give the name of the Libertarian Party candidate.

### The 1992 Libertarian Campaign for Governor

33. The Libertarian Party campaign for governor produced 173 radio commercials and 200 television commercials in the four to five major markets. It issued numerous press releases and participated in voter educational programs and received endorsements from advocacy groups. Candidate McLaughlin traveled over 12,000 miles and participated in 44 television, radio and newspaper interviews. He requested to participate in televised gubernatorial debates but was not allowed to do so.

34. The Libertarian Party intends to run candidates in future elections in North Carolina, including but not limited to the 1993 municipal elections and the 1994 and 1996 general elections.

35. The Libertarian Party's gubernatorial committee showed expenditures of $15,707.60 to obtain a vote total of 104,983. This is a cost per vote of $0.15. The Democratic contender spent $5.10 per vote and the Republican contender spent $5.04 per vote. The average expenditure for winning candidates for the North Carolina House of Representative seats was $18,509.29.

### 1992 Election Result

36. The Libertarian Party obtained ballot access in all fifty states and the District of

Columbia in 1992. The party and its political action committee (51–92) spent a total of $505,000.00 to obtain ballot access. Forty-two thousand dollars ($42,000.00) was spent in North Carolina for this purpose.

37. The single most expensive item in the Libertarian Party's national campaign for the presidency was ballot access cost.

38. No Libertarian Party candidate was elected to any office but the Party intends to sponsor candidates in future elections.

39. The total vote in the 1992 general election for presidential electors was 2,611,-850 distributed as follows: Democratic 1,114,042; Republican 1,134,611; Libertarian 5,171; Unaffiliated (Perot) 357,864; New Labor (write-in) 41; New Alliance (write-in) 59; and Socialist Workers (write-in) 12. The total vote for governor was 2,595,184 of which the Libertarian Party candidate received 104,983. Thus, the Libertarian Party's candidate for governor received over four percent (4%) of the votes cast which was twice the number of signatures originally required to become a certified political party, but well under the ten percent (10%) required by N.C.Gen.Stat. § 163–96(a)(1) to remain certified.

## II.

### Discussion of Law

In *Burdick v. Takushi,* 504 U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court emphasized that while voting is one of the more fundamental rights under our constitutional structure, such a right is not absolute. Both practically and because of specific provisions in the Constitution, the government will necessarily not only have an interest but a duty to make sure the electoral process produces order as opposed to chaos. *Burdick v. Takushi,* 500 U.S. at ——, 112 S.Ct. at 2063, 119 L.Ed.2d at 253. Electoral laws inevitably place some burden and restrictions on voters. However, the state's important duty to maintain order would be unduly, if not dangerously, circumscribed by requiring it to advance a compelling state interest for every electoral law restriction. *Id.*

The Supreme Court placed its imprimatur on the analysis set out in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Because each case will involve different rights and interests, a flexible, case specific standard is to be employed in reviewing challenges to election laws. *Burdick v. Takushi,* 500 U.S. at ——, 112 S.Ct. at 2063, 119 L.Ed.2d at 253. A court must:

> [w]eigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* [*Anderson v. Celebrezze,* 460 U.S.], at 789, 75 L.Ed.2d 547, 103 S.Ct. 1564 [1570]; *Tashjian [v. Republican Party of Connecticut,* 479 U.S. 208], *supra,* at 213–214, 93 L.Ed.2d 514, 107 S.Ct. 544 [547–549].
>
> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. [——], [——], 116 L.Ed.2d 711, 112 S.Ct. 698 [701] (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson, supra,* [460 U.S.] at 788, 75 L.Ed.2d 547, 103 S.Ct. 1564 [,1569]; *see also, id.,* at 788–789 n. 9, 75 L.Ed.2d 547, 103 S.Ct. 1564 [1569–1570].

*Id.* 500 U.S. at ——, 112 S.Ct. at 2063, 119 L.Ed.2d at 253.

At first blush it may appear, because voters are the primary blocks of a democratic system, that voting qualification restrictions

should be subjected to a more demanding test, whereas the rights of candidates or groups to get on an electoral ballot may be viewed under a less rigorous standard. However, the Supreme Court does not find such distinctions to be per se determinative because the rights of voters and the rights of candidates to access to the ballots do not permit a neat separation. *Id.* 500 U.S. at ——, 112 S.Ct. at 2065, 119 L.Ed.2d at 256. Laws which affect candidates necessarily impact on voters. *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 855–856, 31 L.Ed.2d 92 (1972). The same is true with respect to political parties which may embody interests of even greater concern than mere individual candidates. *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982); *Patriot Party of Pennsylvania v. Mitchell,* 826 F.Supp. 926, 934 n. 7 (E.D.Pa.), *aff'd,* 9 F.3d 1540 (3d Cir.1993).

■ Nevertheless, it is only when the restrictions are real and substantial, that the Court must review them under a heightened standard. *Patriot Party of Pennsylvania v. Mitchell,* 826 F.Supp. at 934 n. 7. The electoral process has the fundamental function of selecting one out of the field of candidates for a particular office, as opposed to merely providing an outlet for short term political goals or frustrations. *Burdick v. Takushi,* 500 U.S. at ——, 112 S.Ct. at 2065, 119 L.Ed.2d at 256. "Attributing to elections a more generalized expressive function would undermine the ability of the states to operate elections fairly and efficiently." *Id.*

■ Consequently, in reviewing cases such as the instant one which involve questions of ballot access, the Court will employ a more heightened standard requiring a greater showing of compelling state interests only to the extent the restrictions to the ballot are found to be severe, such as being exclusionary. *Patriot Party of Pennsylvania v. Mitchell,* 826 F.Supp. at 934. Except for the equal protection violations, none of the challenges presented in this case, alone or in combination, can be deemed severe. However, when a restriction violates the Equal Protection Clause of the Fourteenth Amendment, the Court must apply a strict scrutiny or fundamental right standard of equal protection analysis. *Norman v. Reed,* 502 U.S. ——, —— n. 8, 112 S.Ct. 698, 705 n. 8, 116 L.Ed.2d 711, 723 n. 8 (1992); and *Anderson v. Celebrezze,* 460 U.S. at 786 n. 7, 103 S.Ct. at 1568–1569 n. 7 (citing *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; and *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974)). Under this test, differing treatment may not be arbitrary but must bear some relevance to the object of the legislation. *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; and *Patriot Party of Pennsylvania v. Mitchell,* 826 F.Supp. at 934. Of course, the discrimination must also be shown to be invidious. *American Party of Texas v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). As will be seen, this case presents just such problems.

### A.

### Constitutionality of N.C.Gen.Stat. § 163–97 that Recognized Minor Party Must Obtain Ten Percent of the Vote to Retain Ballot Access

Plaintiffs allege that the North Carolina statutory scheme violates the First and Fourteenth Amendments of the United States Constitution in that it violates the rights of association, free speech, and access to the political system. Before examining the argument, it will first be helpful to take a look at the election laws in question.

Plaintiffs' first attack is on the laws defining and regulating the existence of political parties. In order to be recognized by the state and allowed access to the ballot, a political party must fulfill one of two prerequisites. N.C.Gen.Stat. § 163–96(a). The first defines an established political party as:

> Any group of voters which, at the last preceding general State election, polled for its candidate for Governor, or for presidential electors, at least ten percent (10%) of the entire vote cast in the State for Governor or for presidential electors;

N.C.Gen.Stat. § 163–96(a)(1). The Court will refer to this class of party as a major party. A second type of political party is defined as:

Any group of voters which shall have filed with the State Board of Elections petitions for the formulation of a new political party which are signed by registered and qualified voters in this State equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor.

N.C.Gen.Stat. § 163–96(a)(2). This class of party will be referred to as a recognized minor party.[1] It includes newly formed and existing political organizations which are seeking ballot access for the first time or which previously had obtained such access but did not receive ten percent (10%) of the vote for governor or president in the last general election.

The candidates of both major and recognized minor parties are allowed to identify their party affiliation on election ballots. Also, voters may register their party affiliation with either a major or recognized minor party. However, the recognized minor party, which has just obtained ballot access, nominates its candidates through the convention process, N.C.Gen.Stat. § 163–98, as opposed to primary elections, N.C.Gen.Stat. § 163–104. If the recognized minor party wins ten percent (10%) of the vote, it will then nominate candidates via the primary election process for the next election.

Recognition as a political party is not permanent. Any party which "fails to poll for its candidate for governor, or for presidential electors, at least ten percent (10%) of the entire vote cast in the State for governor or for presidential electors at a general election ... shall cease to be a political party within the primary and general election laws...." N.C.Gen.Stat. § 163–97. Such a party is deemed to have expired from official recognition. N.C.Gen.Stat. §§ 163–97 and 163–97.1. It will not be able to use the primary election process to nominate candidates for the next election. Consequently, once a party has "expired," registered voters of that party will have no primary in which to vote and are required to change their affiliation to a recognized party or be designated as unaffiliated. N.C.Gen.Stat. § 163–97.1.[2] Of course, after a party "expires," it may again obtain status as a recognized minor party by petition as provided for in N.C.Gen.Stat. § 163–96(a)(2).

In their brief, plaintiffs argue that the requirement that a recognized minor party obtain ten percent (10%) of the gubernatorial or presidential vote places an undue burden on a minor party's right to ballot access. However, at oral argument, plaintiffs conceded, and correctly so, that North Carolina's requirement that a party receive ten percent (10%) of the votes cast in an election for ballot access is, standing alone, constitutional. Indeed, such a standard is supported by case law. *Jenness v. Fortson*, 403 U.S. 431, 439–440, 91 S.Ct. 1970, 1974–1975, 29 L.Ed.2d 554 (1971) (requirement of 20% of vote to be a political party is constitutional); *Patriot Party of Pennsylvania v. Mitchell*, 826 F.Supp. at 937 (requirement of 15% of registered voters to become a major political party upheld); *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375 (10th Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983) (10%).

A state has a legitimate, i.e. important regulatory, interest in demanding that a party have a significant modicum of support before it should be allowed to have its name

---

**1.** North Carolina refers to such parties as new parties (*see* N.C.Gen.Stat. §§ 163–96 and 163–98) even though they may be a pre-existing political organization. This is likely because a party first obtains official recognition by going through the petition process and is, thus, a newly recognized party. Even though a party may have gained ballot access in the previous election, if it did not obtain ten percent (10%) of the vote for governor or president (N.C.Gen.Stat. § 163–97), it will still be considered a "new" political party when again it petitions for and obtains ballot access for the next election. To avoid the confusion of calling an existing political party such as plaintiff a new party, the Court will refer to such groups as minor political parties.

**2.** The parties stipulated at oral argument that the normal procedure to implement this change is that said voters are sent a communication telling them that they have a right to designate their affiliation with any recognized political party, i.e. one which has received ten percent (10%) of the vote. Voters are given time to make such an election. However, if they fail to do so, election board officials change the affiliation to "unaffiliated."

on the ballot. *Jenness*, 403 U.S. at 442, 91 S.Ct. at 1976. Consequently, at oral argument, plaintiffs restricted their challenge to contending that the disparity between the two percent (2%) ballot access requirement of N.C.Gen.Stat. § 163–96(a)(2) and the ten percent (10%) retention requirement of N.C.Gen.Stat. § 163–97 is arbitrary, capricious and unnecessary. They argue that the state has no legitimate interest in this two-tier system and that it creates an unconstitutional burden on new parties. The Court disagrees.

■ It is well established that a state may impose reasonable restrictions to limit access to the ballot and control the number of parties and candidates appearing on the ballot. Appropriate reasons for these restrictions include guarding against splintered parties, ensuring political stability, preventing unrestrained factionalism, avoiding voter confusion, preventing frivolous or fraudulent candidacies and assuring that the victor is the choice of at least a strong plurality of voters. *Storer v. Brown*, 415 U.S. 724, 729, 94 S.Ct. 1274, 1278–1279, 39 L.Ed.2d 714 (1974); *Bullock v. Carter*, 405 U.S. at 145, 92 S.Ct. at 856–857; *Jenness*, 403 U.S. at 442, 91 S.Ct. at 1976; *Williams v. Rhodes*, 393 U.S. at 24, 89 S.Ct. at 7.

The Supreme Court has noted that a central concern of the founders of our republic is the need to avoid factionalism. *Storer*, 415 U.S. at 736, 94 S.Ct. at 1282 ("California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government. *See The Federalist*, No. 10 (Madison).") The cacophony of disputing voices from numerous small parties could drown out voices seeking political consensus. "Moreover, a state has an interest, *if not a duty*, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Jenness*, 403 U.S.

at 442, 91 S.Ct. at 1976 (emphasis added). It is not the duty of this Court to find whether there is an easier way for a party to gain access to the ballot, but only to decide whether the restrictions placed upon a party are unduly burdensome.

■ North Carolina, in the interest of preventing factionalism and general confusion, has established a two-tier system differentiating between ballot access and ballot retention which is similar to that created by many other states. These two-tier systems have consistently withstood court scrutiny. In *Jenness*, the Supreme Court evaluated a two-tier system that created two distinct political groups. A "political party" and a "political body." A "political party" was one whose candidate received twenty percent (20%) or more of the vote at the most recent gubernatorial or presidential election. A "political party" had to choose its candidate through a primary election. A "political body," on the other hand, could have its candidate's name on the ballot if it has obtained signatures from five percent (5%) of electors eligible to vote in the last election. *Id.* at 433–34, 91 S.Ct. at 1971–1972. This two-tier system was upheld. *Id.* at 440, 91 S.Ct. at 1975. The same results have obtained in the lower courts. *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375 (5% ballot access—10% retention); *Socialist Workers Party v. Hechler*, 696 F.Supp. 190, 193 (S.D.W.Va. 1988), *aff'd in part*, 890 F.2d 1303 (4th Cir. 1989), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990) (1% ballot access—10% retention); *see also Baer v. Meyer*, 728 F.2d 471 (10th Cir.1984)—(two-tier system—10% retention). Thus, two-tier systems even more rigorous than North Carolina's have been recognized as valid.

[9] The fact that North Carolina has chosen to make ballot access easier[3] does not logically require it to make ballot retention easier as well. The purpose of the two vehi-

---

3. North Carolina has chosen to make ballot access relatively easy by only requiring a gathering of signatures of two percent (2%) of the people who voted in the last election. This is far below the five percent (5%) level which, standing alone, is presumptively permissible. *American Party of Texas v. White*, 415 U.S. 767, 786–787, 94 S.Ct. 1296, 1309, 39 L.Ed.2d 744, 764 (1974). And, it

needs to be pointed out that the two percent (2%) requirement only includes the percentage of the number of persons who voted in the last election as opposed to the registered voters, which number may be considerably larger. *Compare Jenness v. Fortson*, 403 U.S. 431, 432, 91 S.Ct. 1970, 1971, 29 L.Ed.2d 554 (1971).

cles for showing support among the electorate has two entirely different purposes. While both ensure that the election ballots are not cluttered by numerous small groups, the lower ballot access requirement actually gives a group a chance to prove itself when it otherwise would be kept off the ballot. It is an inclusive, not an exclusive policy—a safety valve promoting political participancy while protecting the ballot. However, if a party cannot show a significantly increased interest in its candidates after campaigning for them, the state has a right to question whether that party should advance to the next step, which is running candidates in the primary elections. It is not unfair to expect a party to improve its showing of support from the petition process in order to be accorded automatic ballot access, including that of the primary elections.[4] Of course, whether that extra percentage should be five percent (5%), eight percent (8%), or ten percent (10%) is not a matter for the Court to resolve. It is sufficient to find that the ten percent (10%) level, standing alone, as conceded by plaintiffs, is a constitutional one.

Finally, small parties receive a benefit from the two-tier system which plaintiffs fail to acknowledge. A major party is required to nominate candidates through the primary process which can be expensive and require a significant number of party members. On the other hand, the recognized minor party does not have that "Procrustean requirement of establishing elaborate primary election machinery." *Jenness,* 403 U.S. at 438, 91

S.Ct. at 1974. It may use the nomination convention until it reaches the ten percent (10%) support level. Considering all of these factors, the two-tier system is a reasonable and legitimate one for the state to impose.

### B.

### *Disaffiliation*

Plaintiffs next argue that North Carolina's disaffiliation requirement of N.C.Gen.Stat. § 163–97.1 is unconstitutional. As noted previously, Section 163–97.1 requires that if a party fails to achieve ten percent (10%) of the votes in a gubernatorial or presidential election, it is deemed not to exist for purposes of the primary and general election laws. Consequently, all voters registered as members of that party are registered to an "expired" party and must either affiliate with a recognized party or be registered unaffiliated. Plaintiffs argue that they are arbitrarily denied access to the political system, freedom of association and treated unequally compared to the major parties because of this requirement.[5] They claim that they have a right to have this list maintained in order to keep track of their affiliates and avoid having their members re-register after every election.

Plaintiffs' argument assumes that the state has created the registration process in order to permit political parties to keep track of those voters who affiliate with them. However, a perusal of Chapter 163 of the General

4. The Court also notes that plaintiffs have not made a very strong showing of support in this case. They can only point to one election, the 1992 election for governor, where they have received greater than two percent (2%) of the actual votes. That candidate received about four percent (4%) of the vote. This single showing does not suggest that a political party with a strong modicum of support has been victimized or frozen out by the two-tier ballot access-retention system. Indeed, the four percent (4%) level is still below even the five percent (5%) ballot access level approved by the Supreme Court. *American Party of Texas v. White,* 415 U.S. 767, 786–787, 94 S.Ct. 1296, 1309, 39 L.Ed.2d 744, 764 (1974).

5. Plaintiffs asserted in their pleadings that this disaffiliation process had made it impossible for them to examine the voter lists and determine

those voters who had registered as Libertarian but were now designated unaffiliated because the Libertarians failed to meet the ten percent (10%) requirement of N.C.Gen.Stat. § 163–97. They claimed that this was unfair because established parties always can tell, both before and after the election, which voters affiliated with them.

At oral argument however, plaintiffs conceded that they were able to gain access to the voting records after the election and before they were corrected. The parties agreed at oral argument that plaintiffs could examine the registration lists for free any time that they are considered a political party by the state and may examine the list for a fee even when they are not. Furthermore, after the election they have access to the lists which must remain uncorrected for at least 90 days. N.C.Gen.Stat. § 163–97.1. Thus, they do not suffer any great burden in their access to the names of their party members.

Statutes would seem to indicate a different purpose—that of allowing party affiliates to vote in party primaries and enable the state to regulate this voting. Only parties recognized by the state as an established party (receiving ten percent (10%) or more of the vote) may have primaries. N.C.Gen.Stat. § 163–104, *et seq.* The plaintiffs, however, after failing to receive ten percent (10%) of the vote are no longer considered a political party for any purpose and will have no primaries. Therefore, the state has no interest or need to continue to keep a list of that party's registered voters. Plaintiffs' argument that the purging of their party's name unfairly deprives them of a record of their members is unpersuasive in light of the fact that the state is not in the business of keeping records for political parties' affiliates. That job belongs to the party itself.

Plaintiffs argue their position using two Tenth Circuit cases. In *Baer v. Meyer,* 728 F.2d 471, the Tenth Circuit, in a very fact bound decision, upheld a district court's decision to require the State of Colorado to permit affiliation designation for the Citizens and Libertarian Parties which had not obtained ten percent (10%) of the vote in order to be recognized as a major political party. The court spoke of "today's political realities" and the need for a political party to obtain information as the "key to successful political organizations and campaigning." *Id.* 728 F.2d at 475. Because voter registration was computerized, it found that the administrative burden on the state would be relatively minor in that registration officials could merely use the letter "C" for Citizens Party and "L" for Libertarian Party. It carefully noted that its ruling would not require the Secretary of State to recognize any political organizations other than the two in front of it.

However, a little later in *Rainbow Coalition v. Oklahoma State Election Bd.,* 844 F.2d 740 (10th Cir.1988), the court permitted the State of Oklahoma to continue to use its similar disaffiliation statute. Like North Carolina, in Oklahoma, when a party obtained recognition by petition, it thereafter had to receive ten percent (10%) of the vote or it would lose its recognized status and

affiliation privilege. While only three of the Oklahoma counties had computerized election records, the court held that the "administrative burden in and of itself would not be sufficient to justify infringing important associational rights...." *Id.* at 747. Considering the slight administrative burden in conjunction with the state's greater interest in controlling the registration affiliation of fractional interests, the court upheld the statute.

The Court finds the *Rainbow* decision more persuasive. In neither *Baer* nor *Rainbow Coalition,* did the court identify the real interest behind voters listing their party affiliation. Rather, both decisions merely focused on the ancillary benefit, i.e. that listing of party affiliation provided help to parties soliciting persons interested in their political goals. Notwithstanding, the court in *Rainbow Coalition* upheld laws restricting voter designation of party affiliation to major parties. The decision in *Baer* was limited to the two parties before the court and it was not clear whether the affiliation registration injunction would be indefinite or when the affiliation right would cease. These further difficult and unresolved issues persuade this Court that the Tenth Circuit's later decision in *Rainbow Coalition* as opposed to *Baer* should be followed.

The state has a legitimate interest in preventing "frivolous and insubstantial attempts to designate party affiliation on the registration form," *Baer v. Meyer,* 728 F.2d at 475, or the "registration of tiny fractional interests," *Rainbow Coalition,* 844 F.2d at 747. Defendants do not argue that there is any great administrative burden in leaving the Libertarian Party designation on the record. But, that is not determinative. It is self-evident that if all political parties, no matter how small, had a right to have voters list themselves as being affiliated with them, the list could become sizeable; thereby posing possible administrative burdens and also causing confusion for registrars, such as trying to keep track of parties whose names are similar. The voters could suffer prejudice as well. Being affiliated with a major party or being unaffiliated allows voters the possibility of voting in the primary elections. N.C.Gen.Stat. § 163–59. If numerous small

groups were given affiliation rights, this would shut out those voters from the primary process, thereby possibly increasing the feeling of alienation and disenfranchisement. The dangers of factionalism, confusion, and over-reaching would be significantly increased.

Under plaintiffs' theory, political parties have a right to affiliation designation which should never be eliminated. That position is not constitutionally supported nor is it practical. At some point the state must update its records in order to eliminate insubstantial or defunct parties. Small parties often wax and wane in strength. It would be overly burdensome and create a climate ripe for confusion to require a state to note the affiliation of every party, however minute or no matter how long defunct.

A party becomes insubstantial and irrelevant for the state's purposes when it is not eligible to participate in a primary election. At this time, the only reason for the state not to eliminate the party from the registration records would be to help promote the party. This is not a permissible state purpose.[6] Therefore, the Court finds nothing unconstitutional in the state purging the designation of an "expired political party" from its records pursuant to N.C.Gen.Stat. § 163–97.1.

### C.

### Signature Verification Fee of Five Cents and Notarization Requirement of N.C.Gen.Stat. § 163–96(b)

■ Plaintiffs make a number of challenges to the constitutionality of N.C.Gen. Stat. § 163–96(b).[7] The Court will first address the attack on the five cent signature verification fee and notarization requirements.

In order to achieve ballot access, the statute requires minor political parties to obtain verified signatures of two percent (2%) of the total number of voters who voted in the most recent general election for governor, includ-

---

**6.** In a post-argument submission, plaintiffs suggest as a compromise that parties which do not obtain ballot access be allowed to seek recognition as a party, and perhaps pay a fee, and that the state then keep track of their members. However, this still keeps the state embroiled in the process of tracking party affiliation solely to benefit parties for whom it is helpful. And, as will be discussed next, it would not be able to restrict applications from groups, however small and numerous, based on financial ability to pay a fee.

**7.** § 163–96. "Political party" defined; creation of new party.

 \* \* \* \* \* \*

(b) Petitions for New Political Party....

The petitions must state the name and address of the State chairman of the proposed new political party.

The validity of the signatures on the petitions shall be proved in accordance with one of the following alternative procedures:

(1) The signers may acknowledge their signatures before an officer authorized to take acknowledgments, after which that officer shall certify the validity of the signatures by appropriate notation attached to the petition, or

(2) A person in whose presence a petition was signed may go before an officer authorized to take acknowledgments and, after being sworn, testify to the genuineness of the signatures on the petition, after which the officer before whom he has testified shall certify his testimo-

ny by appropriate notation attached to the petition.

Each petition shall be presented to the chairman of the board of elections of the county in which the signatures were obtained, and it shall be the chairman's duty:

(1) To examine the signatures on the petition and place a check mark on the petition by the name of each signer who is qualified and registered to vote in his county.

(2) To attach to the petition his signed certificate

 a. Stating that the signatures on the petition have been checked against the registration records and

 b. Indicating the number found qualified and registered to vote in his county.

(3) To return each petition, together with the certificate required by the preceding subdivision, to the person who presented it to him for checking.

The group of petitioners shall submit the petitions to the chairman of the county board of elections in the county in which the signatures were obtained no later than 5:00 P.M. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections as provided in subsection (a)(2) of this section. Provided the petitions are timely submitted, the chairman of the county board of elections shall require a fee of five cents (5¢) for each signature appearing and shall proceed to examine and verify the signatures under the provisions of this subsection. Verification shall be completed within two weeks from the date such petitions are presented and the required fee received.

ing 200 registered voters from each of four different congressional districts. The signers of the petition or the person in whose presence the petition was signed must sign before an officer authorized to take acknowledgements and "testify to the genuineness of the signatures on the petition." This is often done by signing before notary publics who often charge for the service. Next, the petition is presented to the chairman of the appropriate county board of elections who examines the signatures on the petition to determine whether the signer is a qualified and registered voter of the county. The chairman must collect a fee of five cents for each signature appearing on the petition.

Plaintiffs argue that the five cent verification fee and the notarization requirement pose an undue burden on the right to ballot access of minor parties in violation of the First and Fourteenth Amendments. Plaintiffs point out that North Carolina is one of only three other states which impose a petition fee. (The others being Florida, Nevada and Utah. *See* Bradley A. Smith, *Judicial Protection of Ballot–Access Rights: Third Parties Need Not Apply*, 28 HARV.J. ON LEGIS. 167, 215 n. 252 (1991)). Plaintiffs also complain that the two-step process of requiring both signature acknowledgements (notarization) and the verification fee produces undue hardship on minor political parties. Finally, plaintiffs show that the five cent signature verification fee and notarization requirement is not uniform among all individuals or groups seeking ballot access and in any event it is only minor political parties which must suffer both a five cent verification fee and notarization requirement. They postulate that they are unfairly deprived of a right to the political process by being required to spend a disproportionate amount of money on ballot access ($42,000.00) as opposed to

presenting their issues to the public in the campaign ($16,000.00).

Defendants assert, as their sole justification for the signature verification fee, that the state has a right to recoup some of the costs of verifying signatures.[8] With respect to the notarization requirement, defendants argue that this is a legitimate procedure in order to prevent fraud so that a petition gatherer could not just take a telephone book and copy names.

The permissibility of a signature verification fee standing alone raises serious constitutional questions. A requirement of fee payment in order to gain ballot access may eliminate candidates and thus impacts not just on candidates but on voters as well. *Clements v. Fashing*, 457 U.S. at 964, 102 S.Ct. at 2844. The political tradition in this country is to greet with hospitality all candidates irrespective of their economic status. *Id.* Thus, a system which selects candidates based solely on the ability to pay a fee without providing alternative means for ballot access will violate the Constitution. *Lubin v. Panish*, 415 U.S. at 718, 94 S.Ct. at 1321. When a state advances an interest in attempting to regulate the ballot through filing fees in order to relieve the state treasury of certain costs, it must make a showing of necessity. *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92. For example, the actual cost of processing an application may be just such a reasonable and necessary cost. *Id.* 405 U.S. at 148 n. 29, 92 S.Ct. at 858 n. 29.

The argument of a state that its fee only defrays certain election or ballot access costs will initially be deemed suspect because of the nature of the rights involved. *Dixon v. Md. State Administrative Election Laws*, 878 F.2d 776, 783 (4th Cir.1989). Costs which "appear to be simply concomitant of

---

8. At oral argument and in their brief, defendants' counsel estimated the amount of time that it took to verify signatures and came up with a figure showing that at five cents per signature county boards received $3.00 per hour for their work. However, the record does not contain actual facts concerning the amount of time needed to conduct the signature verification. Therefore, the Court cannot determine whether this five cent fee in fact is a reasonable justification. *See Dixon v. Md. State Administrative Election Laws*,

878 F.2d 776, 783–84 (4th Cir.1989). Defendants not only have the burden of proof on that issue, but must show "it is necessary to raise these revenues in this manner." *Id.* at 784. Furthermore, presidential preference primary candidates, N.C.Gen.Stat. § 163–213.5, must pay 10¢ per signature. No justification for this disparity has been presented. However, the Court need not resolve those matters on such grounds because the statute cannot be enforced for other, more serious, concerns.

the State's legislative choice to hold an election" are not costs which a state may charge to candidates. *Id.* While the state argues that the costs merely reflect time spent checking signatures, it has not presented actual figures detailing the costs as required. *Id.* Nor has it justified the total amount of the fee ($3,200.00) in relation to costs assessed for other services or to other candidates. While these deficiencies raise questions about the continued permissibility of fee verification charges, there is the additional problem that the petition must be notarized which itself produces a not insubstantial burden to minor parties.

■ The notarization requirement by itself has been upheld albeit in different circumstances. In *Libertarian Party of Va. v. Davis,* 766 F.2d 865 (4th Cir.1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986), the court recognized that a state had an interest in assuring the genuineness of signatures and, therefore, could impose a notarization requirement. It adopted Judge Merhige's reasoning in *Howlette v. City of Richmond, Va.,* 485 F.Supp. 17 (E.D.Va.), *aff'd,* 580 F.2d 704 (4th Cir. 1978). However, Judge Merhige reached his decision on a number of grounds. One of them was that plaintiffs failed to sufficiently meet their burden of proof by showing that the notarization requirement was impractical or unusually burdensome. The court of appeals affirmed and specifically cited *American Party of Texas v. White,* 415 U.S. at 786, 94 S.Ct. at 1308–1309, where the Supreme Court rejected a challenge to notarization based on burdensomeness because the parties failed to demonstrate in the record impracticality or unusual burden.[9]

The instant case is unusual in that North Carolina has both a notarization and a verification fee requirement. Furthermore, only minor political parties are subject to both requirements. The ostensible purpose of both is to prevent fraud by making sure only qualified voters sign the petition. The state has not advanced an interest in having both requirements, and then only imposing them on minor political parties. The Court need not render a decision as to whether the signature verification requirement and the notarization requirement are independently unconstitutional. It is sufficient that the combination of both requirements in connection with the uneven application of them to minor political parties justifies their being enjoined. The North Carolina signature verification fee and notarization requirements of N.C.Gen. Stat. § 163–96(b) run afoul of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because of their uneven application.

There are four classes of individuals or organizations which must pay the signature verification fee. As previously noted, N.C.Gen.Stat. § 163–96(b) requires minor political parties to pay five cents per name for two percent (2%) of the voters. Pursuant to N.C.Gen.Stat. § 163–123 write-in candidates must present a petition containing the names of 500 qualified voters and are charged a five cent per name verification fee. Unaffiliated candidates for state-wide office must collect petitions containing names of two percent of the voters and pay a five cent signature verification fee. N.C.Gen.Stat. § 163–122. Presidential preference primary candidates may be nominated by the petition process and are charged a ten cent signature verification fee. N.C.Gen.Stat. § 163–213.5.

9. A burden of signature verification or notarization fee is a factor which a court may consider in evaluating impediments to ballot access. The Supreme Court in *Jenness v. Fortson,* 403 U.S. 431, 439, 91 S.Ct. 1970, 1974–1975, 29 L.Ed.2d 554 (1971), made a point of noting the lack of a notarization requirement in assessing the combination of restrictions which might have made the petition requirement unduly burdensome. In the instant case, petitions must be obtained in at least four different congressional districts, thereby increasing the number of petition gatherers needed and the burden of the notarization requirement.

There are ways to ameliorate the financial burden of a notarization requirement. In *Merritt v. Graves,* 702 F.Supp. 828 (D.Kan.1988), the court upheld a notarization requirement. However, there the notarization service was provided free of charge by county election officers or election commissioners. (The court also found as a fact little evidence that the expense had an inhibiting effect. *Id.* at 832.) Also, the state could accept unsworn declarations under penalty of perjury. *See* 28 U.S.C. § 1746.

There are two categories of candidates or groups wherein no signature verification is required. The first is party primary candidates who do not pay the filing fee. They must obtain petitions for which no signature verification fee is required. N.C.Gen.Stat. § 163–107.1. Second, North Carolina does not charge signature verification fees for groups which petition to get referendum propositions on the ballot. Examples of such petitions are as follows: referendum issues for fire protection districts, N.C.Gen.Stat. § 69–25.1; change of the form of municipal government, N.C.Gen.Stat. § 160A–104; to approve the sale of alcoholic beverages, N.C.Gen.Stat. § 18B–601. Finally, none of the above categories, whether they are charged a signature verification fee or not, has a notarization requirement, except for those persons wishing to form a political party pursuant to N.C.Gen.Stat. § 163–96(a).

The state argues, as it must, that North Carolina has a legitimate and compelling reason to establish various classes with respect to ballot access. For example, it argues that it has the right to distinguish between a political party, which can nominate a number of different candidates, and write-in or unaffiliated candidates which only represent one person. The state also attempts to distinguish referendum issues as being an animal of a different species and, therefore, not fairly compared to minor party candidates. Finally, with respect to the fact that individuals who associate with a major political party may obtain ballot access without paying a signature verification fee, defendants argue again that this does not favor a major party but rather recognizes the distinction between a minor political party and an individual candidate of a major party.

An immediate problem arises with this last foundation pin of the argument. North Carolina does not charge petition verification fees for candidates for major parties who wish to get on the primary ballot, but does

charge, not only minor parties, but unaffiliated candidates such fees.[10] Thus, the state treats affiliated candidates of major parties and unaffiliated candidates differently. Under these circumstances, it appears that North Carolina's different economic treatment of unaffiliated candidates is likely unconstitutional. *See Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir.1992); and *Dixon v. Md. State Administrative Election Laws*, 878 F.2d 776. However, the state cannot justify the discriminatory treatment of minor parties by pointing out that it treats other groups, i.e. unaffiliated candidates, unconstitutionally as well.[11]

In *Fulani*, the court found that Florida law permitted a waiver of the signature verification fee for any candidate, group or person, including independent candidates or organizations presenting referendum issues, but did not permit a waiver for minor parties. It held that the state could not justify favoring identified political groups based on associational preference. *Id.* 973 F.2d at 1544. It also noted that the burden was a significant one because it forced a party to part with funds needed for an effective campaign and made it more difficult for a minor party to qualify. In justification, the state asserted a variety of interests, such as the qualitative difference between an independent candidate and a party candidacy. However, such a self-justifying explanation for disparate economic treatment was rejected.

The state's asserted interest of assuring that a party has an ongoing political organization with a distinctive character was deemed to be one of diminished importance. *Id.* at 1546. The state does not have a legitimate interest in determining which financially burdened candidates or political parties have a right to waive the verification fee. *Id.* And, as has been noted previously, the court found in an area of economic qualification, the state's interest was severely re-

---

**10.** Unaffiliated candidates need not pay a filing fee, but must pay the signature verification fee. There is no alternate means of getting on the ballot. N.C.Gen.Stat. § 163–122.

**11.** While the constitutionality of the signature verification fees for write-in candidates, unaffiliated candidates and presidential preference pri-

mary candidates may be questionable for lack of an alternative non-economic means of ballot access (*see Dixon v. Md. State Administrative Election Laws*, 878 F.2d 776 (4th Cir.1989) ($150.00 filing fee), that issue is not raised or decided in the instant case.

stricted. *Id.* at 1547. Finally, it further noted, that (as is true in North Carolina) the state did not just classify on the basis of individuals versus groups because referendum organizations similarly were allowed to waive the petition fee, but a group of individuals forming a minor party could not. *Id.* at 1547.

All of these reasons for striking down the invidious discrimination of the signature verification fee against minor political parties exist in the instant case. The state has failed to provide any justification for unevenly applying the signature verification fee. It fails to provide alternative routes to ballot access for impecunious individuals or groups except for candidates of major political parties. It advances no reason for favoring major party candidates. Such action has the effect of freezing the status quo by favoring major party candidates. Nor has the state justified favoring referendum group petitions, which pay nothing, over independent candidates and minor political party petitions. Lacking justification, the Court cannot find that these distinctions are supported by a compelling necessity or even some rational interest. *Id.* The defendants pointed out at oral argument that the statutes arrived in their present position through piecemeal amendment and, therefore, the discrepancies likely were not planned. While quite understandable, that explanation does not suffice to prevent a finding of the statute's unconstitutionality.

There is a further problem with N.C.Gen. Stat. § 163–96(b). Only minor political party organizations must face the double ballot access expense of signature verification fee and costs for notarization of signatures. The state had no explanation for this discrepancy except to point out that again it likely was a

vestigial remain from the piecemeal amendment of election laws. If there were any doubt previously, the dual combination of the signature verification fee and the notarization requirement clearly, unduly burdens minor party resources and violates equal protection. Consequently, the state should be enjoined from enforcing that paragraph in N.C.Gen. Stat. § 163–96(b) requiring:

> The validity of the signatures on the petitions shall be proved in accordance with one of the following alternative procedures:
>
> (1) The signers may acknowledge their signatures before an officer authorized to take acknowledgments, after which that officer shall certify the validity of the signatures by appropriate notation attached to the petition, or
>
> (2) A person in whose presence a petition was signed may go before an officer authorized to take acknowledgments and, after being sworn, testify to the genuineness of the signatures on the petition, after which the officer before whom he has testified shall certify his testimony by appropriate notation attached to the petition[,]

and the further requirement that the county board of elections "shall require a fee of five cents (5¢) for each signature appearing" on the petitions.[12]

### D.

#### *Petition Language of N.C.Gen.Stat. § 163–96(b)*

■ Plaintiffs next argue that the language in N.C.Gen.Stat. § 163–96(b) required to be used by political parties on their ballot

---

12. Plaintiffs also contend that part of N.C.Gen. Stat. § 163–96(b) which requires a five cent signature verification is unconstitutional as applied. Here, plaintiffs argue and present some evidence that approximately ten percent of the signatures declared invalid were actually valid signatures. This amount appears to be not insignificant. In addition, when the invalidated signatures were resubmitted, plaintiffs were charged an additional five cent fee for validating the previously incorrectly invalidated signatures. Thus, plaintiffs were charged a double fee for some of the validated signatures.

Plaintiffs do not request monetary relief for this double charging. Nor, at oral argument, when the Court indicated that such a challenge by plaintiffs would require a trial, did plaintiffs wish to pursue the issue. Instead, plaintiffs consented to a stipulation wherein defendants agreed to enact regulations before the next election which would have the purpose of reducing the high rate of incorrectly invalidated signatures and correct the problem of charging double for signatures incorrectly invalidated but then subsequently validated. However, in light of the instant recommendation, this stipulation may well be moot.

access petition unconstitutionally requires voters to express an intent to organize a political party. Pursuant to N.C.Gen.Stat. § 163–96(b), North Carolina requires that the heading of the petition proclaim in large capital letters: "THE SIGNERS OF THIS PETITION INTEND TO ORGANIZE A NEW POLITICAL PARTY TO PARTICIPATE IN THE NEXT SUCCEEDING GENERAL ELECTION." Plaintiffs argue that this language confuses voters who are asked to sign by making them believe that they must actively participate in the organization of this political group. This confusion allegedly makes the petitioning process more difficult for plaintiffs and misrepresents the purpose of the petition.

Plaintiffs show that the history of this language likely arose out of dicta appearing in *N.C. Socialist Workers Party v. N.C. State Bd., Etc.*, 538 F.Supp. 864 (E.D.N.C.1982). That suit also involved a minor political party's challenge to the constitutionality of N.C.Gen.Stat. § 163–96(b) as previously written. At that time, the statute required that a voter signing a petition for a new political party change his or her affiliation to that party, thereby prohibiting the signatory from voting in a party primary election. In ruling on a motion for a preliminary injunction, the court had before it sufficient affidavits demonstrating voter inhibition to signing the petition for fear of losing a valuable voting right. Consequently, the court prohibited the state from using the words of prior N.C.Gen.Stat. § 163–96(b) whereby the voter both petitioned "for the formation of a new political party" and requested a change in party affiliation. The court's main concern was the impact of the language requiring the change of party affiliation by signing the petition. It found that the state could accept evidence of public support without requiring disaffiliation. This resulted in a dicta suggestion that the state might use a statement of "intent to organize a new party." *Id.* at 867 n. 5. Whether the legislature, in re-

writing N.C.Gen.Stat. § 163–96(b), relied on the dicta in *N.C. Socialist Workers Party* or not does not change the equation. The court's comments were only dicta and the specific challenge raised in this case was not then before that court.

The state claims no interest in using the particular words "intend to organize" and agrees that the language should reflect the purpose of the petition. The purpose of the petition is to demonstrate sufficient voter support for the Libertarian (or other) party so that it will become a legally recognized party in order to be placed on the ballot for the next election. The signer necessarily wants the party to be recognized and placed on the ballot. Implicit in this is that the party in question must be in existence and organized or in the process of being organized. The voter necessarily intends these matters as well. What the voter may not wish to do is to participate in the organization or further organization of the party.

The state has an understandable interest in making the petition purpose known in as few words as possible in order to avoid frustrating the petition process. However, the language must also be sufficiently clear to avoid voter confusion. In the instant case, the state has chosen the language "intend to organize" whereas, the parties agree that the principal purpose for signing appears to be that the voter wishes the party to be legally recognized so that it may appear on the ballot for the next general election.[13] The language also suggests the party is not yet organized. However, political parties such as the plaintiff Libertarian Party may well have a long and relatively successful existence as a minor party. It is understandable that the legislature may have chosen the words "intend to organize" because of the special nature of the North Carolina election laws which treat all newly recognized parties as new parties. Nevertheless, such language

---

**13.** Plaintiffs also argue that the difference between Sections 163–96(b) and 163–122 governing unaffiliated candidates violates equal protection. The latter statute reads: "THE UNDERSIGNED HEREBY PETITION THAT SUBJECT CANDIDATE BE PLACED ON THE APPROPRIATE BALLOT...." However, the purpose of Section 163–96(b) is that a party be *recognized and placed* on the ballot. Thus, the statutes have slightly different purposes, although both share the goal of ballot access. Rather than being discriminatory, a difference in the petition language is proper, if not necessary, to adequately inform the voter.

could possibly cause some minor confusion in that voters may think that the party seeking ballot access has no previous existence and/or that they are personally required to do some organizing. The question is whether such possibilities rise to a constitutional dimension.

Plaintiffs' challenge to the petition language is essentially a facial one. They have not presented sufficient facts, such as the plaintiffs did in *N.C. Socialist Workers Party v. N.C. State Bd., Etc.*, 538 F.Supp. at 865, to show that numerous voters would have signed the petition had it not been for the allegedly offending language. Therefore, because the parties have stipulated that all facts which they would present at a trial are now before the Court, it is determined that plaintiffs have failed to show that the operation of N.C.Gen.Stat. § 163–96(b) petition language in fact deprived them of their constitutional rights. This, of course, would not foreclose a challenge to the petition language in the future upon presentation of sufficient evidentiary support.[14] It does mean that the Court will only review the petition language to see if it is unconstitutional on its face.

Plaintiffs cite two cases in support of their position that the "intend to organize" language of N.C.Gen.Stat. § 163–96(b) imposes an unconstitutional restriction on voter-signers. They are: *Socialist Workers Party v. Hechler*, 890 F.2d 1303; and *N.C. Socialist Workers Party v. N.C. State Bd., Etc.*, 538 F.Supp. 864. The Court finds both cases to be distinguishable and provide little support for plaintiffs' argument. In *Socialist Workers Party v. Hechler*, the petition utilized to nominate candidates for a minority party stated that the person signing had a "desire to vote" for the candidate. The court found that this language violated a voter's right to have a secret ballot when voting and second, that this burden, placed only on small parties, violated the Equal Protection Clause. In *N.C. Socialist Workers Party v. N.C. State Bd., Etc.*, the petition required that the signatory's voting registration would be

changed to the new parties, thus disaffiliating the voter from their prior party.

Both cases are distinguishable because they involved direct consequences to the signatories' voting rights, either in the primary or the general election. In one case, the signatory was forced to publicly reveal his vote, and in the other, to change his party affiliation and forfeit the right to vote in the primary election. The petition language in the present case does not interfere with any important right such as voting and, at worst, suggests that the person signing might be asked at some future date to help organize the party. However, whenever persons sign any petition they necessarily must expect that the consequence of their act will not end with the signing. They may well be contacted again in the future by party supporters asking for money and help—which they can refuse. The wording presently required by N.C.Gen.Stat. § 163–96(b) only, at most, minimally expands the necessary commitment and the expectation of intrusion. While the signer indicates an intent to organize a party, it has not been shown that reasonable people would take this to mean they would be bound to work for the party. The Court will not assume this to be so. On its face, the words cannot be so interpreted and plaintiffs fail to show otherwise in the course of their conducting petition drives.

Although somewhat imprecise, the language is reasonably calculated for its intended purpose. It does not convey sufficient misinformation so as to render it unconstitutional. Different language could certainly be selected to better convey the message that a political party is attempting to be placed upon the ballot. However, it is not the duty of this Court to craft such language. Rather, that is within the province of the legislature.

### E.

### *Totality of Statutory Restrictions*

■ Finally, the Court must examine whether the "totality" of North Carolina's statutory scheme violates plaintiffs' constitu-

---

14. Plaintiff's may feel that they can factually show that the language is unduly burdensome and decide to again bring suit. The state, however, lacking any significant reason to keep the language as it is, may wish to reexamine the language prior to that time.

tional rights. In considering this issue, the Court must determine whether the laws, operating in conjunction, "freeze" the status quo by preventing all candidates, other than the two major parties, from any realistic access to the ballot. *Jenness v. Fortson,* 403 U.S. at 439, 91 S.Ct. at 1974; *American Party of Texas v. White,* 415 U.S. at 783, 94 S.Ct. at 1307. "The concept of 'totality' is applicable only in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer,* 415 U.S. at 737, 94 S.Ct. at 1282. The primary inquiry is whether a reasonably diligent candidate or party can obtain access to the ballot. *Id.* at 742, 94 S.Ct. at 1285.

■ Plaintiffs assert that the combination of the five cent verification fee, the disaffiliation requirement, the misleading petition language, and the ten percent retention requirement act to freeze the status quo.[15] The Court finds that these requirements have not created such a barrier to the ballot as to freeze the status quo.[16]

In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, the Supreme Court found that the totality of Ohio's statutory scheme froze the status quo making "it virtually impossible for a new political party · · · to be placed on the state ballot." *Id.* at 24, 89 S.Ct. at 7. In *Williams,* the statutory scheme required a new party to obtain the signatures of fifteen percent (15%) of the qualified voters in the last gubernatorial election, over 400,000 signatures, and file the petitions by an early deadline date of February 7. The party would then be required to conduct a primary election conforming to a very rigorous statutory scheme. *Id.* at 27, 33, 89 S.Ct. at 8, 11. The Supreme Court found that the totality of these requirements

violated equal protection by freezing out new parties from the election process.

In the present case, such heavy burdens do not exist. A new party need only obtain the signatures of two percent (2%) of those who voted in the last state-wide election (around 45,000 signatures) to obtain access to the ballot. While the filing deadline for petitions of May 15 arguably is somewhat early in the political season, *Rainbow Coalition v. Oklahoma State Election Bd.,* 844 F.2d at 745 (May 31)), there are no restrictions on when a party may begin to obtain these signatures. *Compare Libertarian Party of Fla. v. State of Fla.,* 710 F.2d 790, 799 (11th Cir.1983), *cert. denied,* 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984), and cases cited. Thus, a party could obtain ballot access right after a general election and have voters affiliate with it almost two years before the next election. This would also give the party plenty of time to use the voter rolls to gather names of sympathetic voters. Even if a party misses the two percent (2%) petition requirement, its candidates can get on the ballot as write-in candidates with only 500 signatures. Furthermore, a new party is not required to incur the expense of primaries but may pick its candidates by convention. Thus, the burden on plaintiffs does not approach that found to be unconstitutional in *Williams.* As to the ten percent (10%) retention requirement, it is a valid requirement and furthermore, it is not a barrier to ballot access because access can be obtained by meeting the two percent (2%) petition requirement.

The Court also finds based on the present record that, for the 1992 election, the expenses caused by the five cent verification fee and notarization were not so great in combination with the other restrictions so as

**15.** The disaffiliation of plaintiffs' registered voters after it failed to poll ten percent (10%) of the vote likely need not be considered in examining the totality of North Carolina's statutory scheme's effect on ballot access. This requirement has little effect on plaintiffs' ability to gain access to the ballot. Plaintiffs dislike the rule because they would like to use voter affiliation rolls kept for purposes of holding primary elections as a means to build their party. However, the state has no duty to allow a party to use its machinery to build party membership. Restrictions which are absolutely valid need not be

considered in evaluating the totality of North Carolina's election laws or ballot access. *See Storer v. Brown,* 415 U.S. 724, 737, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974).

**16.** This is particularly true in reference to future elections in light of the recommendation to declare the present notarization requirement and five cent verification fee unconstitutional. However, even if these burdens were included, ballot access has not been frozen.

to unduly impede ballot access. Plaintiffs spent $42,000 for ballot access in 1992. Around $3,200 of that was in verification fees and some unestablished amount, presumably less than the verification fees, went to notarization. This would mean that the bulk of plaintiffs' expenses went to the gathering of signatures. Such expense is an expected and accepted part of a new party's access to the ballot. *See American Party of Texas v. White*, 415 U.S. at 793–94, 94 S.Ct. at 1312–1313. The extra costs for signature verification fees and notarization costs in North Carolina may well be less than the signature collection costs in states requiring five percent (5%) signatures.

The history of recent elections fails to establish plaintiffs' contention. Prior to the 1984 elections, the signature requirement was only 10,000 people. Under this rule in 1976, three parties obtained enough signatures to be placed on the ballot; the American Party, Labor Party and Libertarians. In 1980, the Citizens Party, Socialist Workers Party and Libertarian Party obtained ballot access. In the 1984 elections, the signature requirement was raised to the present two percent (2%) of voters. This prevented some parties from obtaining enough support to obtain ballot access but certainly did not freeze access as demonstrated by the Socialist Workers Party and the Libertarian Party both gaining ballot access in 1984. In 1988, the New Alliance Party met the two percent (2%) requirement and the Libertarian Party, although failing to do the same, conducted a write-in campaign. In the 1992 race, the Libertarian Party obtained ballot access while the New Alliance Party and Socialist Workers Party conducted write-in campaigns. This history of ballot access for minor parties in North Carolina conclusively demonstrates that the North Carolina statutory scheme does not freeze the status quo, but in fact gives minor parties a fair opportunity to gain ballot access.

Finally plaintiffs argue that several violations of the election laws were committed during the 1992 election in various counties that in combination with the statutory scheme have frozen them out of the political process. Specifically, plaintiffs complain of five instances in which party members had difficulty registering as Libertarian. These errors did not prevent the individuals from eventually registering as Libertarian. Plaintiffs also complain that there were six instances where the state gave election information that failed to note that the Libertarian Party was on the ballot. Again, no adverse result has been demonstrated.

Plaintiffs have not presented any case law which would support their contention that the minor election errors in this case should be considered in combination with a state's statutory scheme in order to determine whether state law freezes the status quo. When deciding whether a statutory scheme is unconstitutional under *Williams*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, *Jenness*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554, and their progeny, minor election errors have not been part of the evaluation. Such errors, unless shown to be intentional or consistent from year to year, would appear only to effect a particular election, not the constitutionality of state election laws. However, even if such errors were considered in totality with the statutory restrictions, they are neither significant nor numerous enough to make the present laws unconstitutional. This is particularly true considering that the violations all occurred after plaintiffs had already gained access to the ballot. The errors clearly did not freeze the plaintiffs out of the political process.

IT IS THEREFORE RECOMMENDED that plaintiffs' and defendants' motions for summary judgment be granted in part and denied in part and that all plaintiffs' claims be dismissed except that it be declared that those parts of North Carolina General Statute § 163–96(b) which provide:

The validity of the signatures on the petitions shall be proved in accordance with one of the following alternative procedures:

(1) The signers may acknowledge their signatures before an officer authorized to take acknowledgments, after which that officer shall certify the validity of the signatures by appropriate notation attached to the petition, or

(2) A person in whose presence a petition was signed may go before an officer authorized to take acknowledgments and, after being sworn, testify to the genuineness of the signatures on the petition, after which the officer before whom he has testified shall certify his testimony by appropriate notation attached to the petition[,]

and the further requirement that the county board of elections "shall require a fee of five cents (5¢) for each signature appearing" on the petitions are unconstitutional as Chapter 163 of the North Carolina General Statutes is presently constituted and, therefore, pursuant to Fed.R.Civ.P. 65 that the defendants, their officers, and agents be enjoined from utilizing, requesting compliance with or enforcing the same.