65 F.3d 1215
 Scott McLAUGHLIN, as a candidate for Governor of North
Carolina and as a representative of the Libertarian Party of
North Carolina; Libertarian Party of North Carolina; The
Libertarian Party; Kathleen Ferrell, as a North Carolina
Voter who desires to remain registered as a Libertarian,
Plaintiffs-Appellants,
v.
NORTH CAROLINA BOARD OF ELECTIONS; William A. Marsh, Jr.,
in his official capacity as Acting Director of the
State Board of Elections, Defendants-Appellees.
 No. 94-1711.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 30, 1995.
Decided Sept. 27, 1995.
 
 ARGUED: James Richard Glover, Glover & Petersen, P.A., Chapel Hill, NC, for appellants. Charles McKinnon Hensey, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for appellees. ON BRIEF: Ann B. Petersen, Glover & Petersen, P.A., Chapel Hill, NC; E. Clark Dummit, Dummit & Associates, Winston-Salem, NC, for appellants. Michael F. Easley, Attorney General, North Carolina Department of Justice, Raleigh, NC, for appellees.
 Before ERVIN, Chief Judge, MOTZ, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Chief Judge ERVIN and Judge MOTZ joined.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 The national Libertarian Party and the Libertarian Party of North Carolina, along with Scott McLaughlin, the state party's most recent candidate for Governor, and Kathleen Ferrell, a North Carolina voter registered as a Libertarian, appeal from a summary judgment order dismissing their claims seeking a declaration that three provisions of the North Carolina election laws unconstitutionally deprive them of rights guaranteed by the First and Fourteenth Amendments and praying for an injunction against their enforcement. We affirm the district court's judgment on all counts.
 
 I.
 
 2
 The relevant facts of this case are not in dispute and were presented thoroughly in the decision below. McLaughlin v. North Carolina Board of Elections, 850 F.Supp. 373 (M.D.N.C.1994). We will only summarize them briefly.
 
 
 3
 The North Carolina election laws provide exactly three ways for a candidate to secure a spot on a general election ballot[1] for any federal, state, county, or municipal office: (1) by becoming the nominee of a major political party selected by primary election; (2) by becoming the nominee of a "new" political party selected at that party's state convention; and (3) by being nominated by petition as an unaffiliated candidate.[2]
 
 
 4
 To qualify as a "new" party for purposes of ballot access, a political party must file with the Board of Elections ("BOE") by June 1 in the same calendar year as the November general election petitions signed by registered voters numbering at least 2% of the total number of votes cast in the most recent general election for Governor,[3] with at least 200 signatures coming from registered voters residing in each of four congressional districts. The party must support the authenticity of each signature by notarized affidavit and also pay to the BOE a verification fee of $.05 per signature. If the BOE determines that the petitions contain the requisite number of valid signatures, it certifies the party as a "new" party under N.C. Gen.Stat. Sec. 163-96(a)(2) & -96(b) (1994), thereby entitling the party to nominate as much as one candidate per office to appear on the general election ballot. Voters are permitted to register affiliation with a party as soon as it becomes certified. If the new party obtains voter registration affiliation equal to or greater than 5% of the total statewide voter registration, its name is sorted alphabetically with the established parties for purposes of column-assignment on the general election ballot. Otherwise, it is assigned a column to the right of the columns assigned to the candidates of the established parties. N.C. Gen.Stat. Sec. 163-140.1. That is, for example, were 5% of all registered voters affiliated with the Libertarian Party, its candidates would appear on the ballot between the Democratic and Republican candidates. Were the Libertarians to become certified as a "new" party yet fail to attract 5% of registered voters, then its candidates would be listed third after those nominated by the two major parties.
 
 
 5
 If a party's nominee for governor or for president polls at least 10% of the votes cast in the previous general election for governor or president, respectively, then that party retains its right to nominate candidates for all state and federal offices in the next general election. We will term such a political organization an "established" political party.[4] Established political parties must nominate their candidates by primary election (unless only one candidate declares for that party's nomination for a particular office). Sec. 163-110. If a party fails to poll for its candidate the requisite 10% of votes cast, "it shall cease to be a political party within the meaning of the primary and general election laws." Sec. 163-97. When a party loses its ballot-qualified status, it also loses the affiliation of its registered voters. Section 163-97.1 provides that when a party "has lost its legal status as provided in G.S. Sec. 163-97," the BOE must direct all county boards of elections to change the registration of "[a]ll voters affiliated with such expired political party ... to 'unaffiliated.' " In order to regain the right to nominate candidates (as well as the right to affiliate voters), it must again become certified as a "new" party by submitting petitions signed by registered voters numbering at least 2% of the total number of votes cast in the prior general gubernatorial election.
 
 
 6
 The Libertarian Party of North Carolina was formed in 1976. It qualified for the general elections of that year by filing petitions with the requisite number of signatures.[5] Two other minor parties qualified as well. Because only the candidates of the Democratic and Republican Parties, Jimmy Carter and then-President Gerald Ford, exceeded the 10% threshold of 167,790 votes, the three minor parties were deemed to have expired by operation of N.C. Gen.Stat. Sec. 163-97. The Libertarian Party qualified anew prior to both the 1980 and 1984 elections but each time failed to poll as many as 10% of the votes (garnering 9677 votes for its 1980 presidential candidate and 4611 for its 1984 gubernatorial candidate). In 1988, the Libertarian Party failed to qualify as a new party. However, its candidate for President did qualify as a write-in candidate. See supra note 1. He received 1263 votes out of 2,134,370 votes cast for President. The Libertarian Party rebounded from its unsuccessful 1988 petition drive to obtain 43,620 valid signatures in its 1992 campaign--twenty more than the 2% required.
 
 
 7
 The Libertarian Party achieved unprecedented success in the 1992 general elections even though none of its candidates was elected. Three of its candidates for the state legislature received over 12% of the vote in their respective races. And the Party's candidate for Governor, plaintiff McLaughlin, polled 104,983 votes--over 4% of the total votes cast--in the gubernatorial election. However, because both McLaughlin and the Party's presidential candidate failed to reach 10% of the total vote, the Party is deemed to "cease to be a political party" for ballot access purposes, and, once the BOE so directs, the county boards of elections will change the affiliation of all 677 voters currently registered with the Party to "unaffiliated."
 
 
 8
 In February 1993, the National and State Libertarian Parties, Scott McLaughlin, and Kathleen Ferrell (collectively, "plaintiffs" or "Libertarians") filed suit in the United States District Court for the Middle District of North Carolina challenging as unconstitutional discrete provisions of the state's election laws and alleging general election improprieties not here relevant. The four specific provisions challenged were: (1) the forced voter disaffiliation provision of Sec. 163-97.1; (2) the requirement of Sec. 163-96(b) that a would-be new party pay a five-cent-per-signature verification fee; (3) the provision in Sec. 163-97 that a party "ceases to exist" for ballot access purposes unless it polls 10% of the vote in the gubernatorial or presidential elections; and (4) the mandate spelled out in Sec. 163-96(b) that a petition for ballot access as a "new" party state that "THE SIGNERS OF THIS PETITION INTEND TO ORGANIZE A NEW POLITICAL PARTY." The suit named as defendants the North Carolina Board of Elections and its acting director, William A. Marsh, Jr.
 
 
 9
 The parties entered into stipulations of fact and filed cross motions for summary judgment. Thereafter, a magistrate judge issued proposed findings and an opinion recommending that those provisions of N.C. Gen.Stat. Sec. 163-96(b) requiring notarization of the signatures on "new party" petitions and requiring payment of 5 cents per signature be declared unconstitutional, and that the Libertarians' other claims for declaratory and injunctive relief be dismissed. Over the plaintiffs' objections, the district court issued an order adopting the findings and recommendations of the magistrate, and entered a final judgment granting plaintiffs declaratory and injunctive relief on their second claim and dismissing their other claims.
 
 
 10
 On appeal, the Libertarians reassert their constitutional challenges to: the provisions of the North Carolina election laws that regulate political parties' access to the ballot; the mandated ballot-petition language; and the Voter Disaffiliation provision. The state has not cross appealed from that portion of the district court's decision below declaring Sec. 163-97 unconstitutional.
 
 II.
 
 11
 The appropriate standard governing constitutional challenges to specific provisions of state election laws begins with the balancing test that the Supreme Court first set forth in Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). As the Court put it in its most recent ballot access decision, that test directs that
 
 
 12
 [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."
 
 
 13
 Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (citations omitted). Despite its explicit endorsement of the Anderson approach, the Burdick Court also reaffirmed a single modification, that election laws which place "severe" burdens upon constitutional rights are subject to strict scrutiny: "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " Id. (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). See also Eu v. San Francisco County Democratic Central Cmte., 489 U.S. 214, 222, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989); Illinois Election Bd. v. Socialist Workers Party, 440 U.S. 173, 184-85, 99 S.Ct. 983, 990-91, 59 L.Ed.2d 230 (1979) (severe restriction must be "least drastic means" to serve compelling interest).[6]
 
 
 14
 In short, election laws are usually, but not always, subject to ad hoc balancing. When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). "The results of this evaluation will not be automatic; ... there is 'no substitute for the hard judgments that must be made.' " Anderson, 460 U.S. at 789-90, 103 S.Ct. at 1570 (quoting Storer, 415 U.S. at 730, 94 S.Ct. at 1279).
 
 
 15
 Within this framework, we will consider each of the Libertarians' three challenges in turn. We subject the district court's determinations whether any particular provision or set of provisions passes constitutional muster to de novo review. Fulani v. Krivanek, 973 F.2d 1539, 1541 (11th Cir.1992).
 
 A.
 
 16
 We first consider the state law provisions restricting political party access to the ballot.
 
 
 17
 As a rule, state laws that restrict a political party's access to the ballot always implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments. That is because "it is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech," Anderson, 460 U.S. at 787, 103 S.Ct. at 1569 (internal quotation omitted), and because "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 10-11, 21 L.Ed.2d 24 (1968); see also Norman v. Reed, supra, 502 U.S. at 289, 112 S.Ct. at 705; Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986). Moreover, the burden that North Carolina's ballot access restrictions impose on protected interests is undoubtedly severe--that is, as history reveals, those regulations make it extremely difficult for any "third party" to participate in electoral politics.[7] It remains only to determine, then, whether the North Carolina rules that govern a party's ability to place its candidates on the general election ballot are the least restrictive means to achieve the "important state interest in requiring some preliminary modicum of support before printing the name of a political organization's candidate on the ballot--the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).
 
 
 18
 This inquiry brings us into hazardous terrain. While all states condition ballot access on a showing of some "preliminary modicum of support," it is beyond judicial competence to identify, as an objective and abstract matter, the precise numbers and percentages that would constitute the least restrictive means to advance the state's avowed and compelling interests. However, the plaintiffs do not ask us to do so. Instead, they urge that the North Carolina election laws themselves expose that the state's ballot access regulations are not the "most narrowly tailored means," Norman, 502 U.S. at 294, 112 S.Ct. at 708, to advance the state's compelling interests. Because North Carolina believes that the support of 2% of those who voted in the previous gubernatorial election is sufficient to get a party on the ballot in the first place, the Libertarians explain, the state cannot also believe that the party's failure to attract 10% of the votes in the subsequent election ipso facto demonstrates that the party lacks the necessary modicum of support that justifies its place on the ballot. In advancing this argument, the Libertarians rely in large measure on the Supreme Court's reasoning in Norman v. Reed and Illinois Election Bd. v. Socialist Workers Party. In both cases the Court held that the state could not require a party that wishes to place a candidate for election in a political subdivision to obtain more petition signatures than required to accord the party ballot access for a statewide race. The Court reasoned that the lesser number conclusively established that the state itself does not consider the greater number the least restrictive means to demonstrate that the party has a significant modicum of support.
 
 
 19
 Unfortunately for the Libertarians, the surface plausibility of their analogy is belied by clear Supreme Court precedent. In Jenness v. Fortson, the Court upheld against constitutional challenge Georgia election laws that distinguished between "political parties" and "political bodies" in ways similar to the different treatment that North Carolina accords established and "new" political parties. In particular, Georgia termed any political organization whose candidate received at least 20% of the vote in the most recent presidential or gubernatorial election a "political party" and provided that it must nominate candidates to be placed on the general election ballot by primary election. Any other political organization was termed a "political body." A nominee of a political body could get his name printed on the general election ballot only by filing a nominating petition signed by at least 5% of the total number of electors eligible to vote in the last election for the office he sought. Jenness, 403 U.S. at 433, 91 S.Ct. at 1971. Similarly, in American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the Court upheld a complicated Texas ballot access scheme that, in much-simplified essence, permitted political parties to gain initial access to the ballot by securing the signatures of persons numbering 1% of the total votes cast in the prior gubernatorial election, but required such parties to poll at least 2% of the votes cast in the gubernatorial election to retain their ballot access.
 
 
 20
 Concluding that Jenness squarely controlled, the district court held below that "the two-tier system is a reasonable and legitimate one for [North Carolina] to impose." 850 F.Supp. at 385. The court properly reasoned that
 
 
 21
 [t]he fact that North Carolina had chosen to make ballot access easier does not logically require it to make ballot retention easier as well. The purpose of the two vehicles for showing support among the electorate has two entirely different purposes. While both ensure that the election ballots are not cluttered by numerous small groups, the lower ballot access requirement actually gives a group a chance to prove itself when it otherwise would be kept off the ballot. It is an inclusive, not an exclusive policy--a safety valve promoting political participancy while protecting the ballot.... It is not unfair to expect a party to improve its showing of support from the petition process to be accorded automatic ballot access....
 
 
 22
 Id. at 384-85. Indeed, we previously have upheld two-tier ballot access schemes that require a party to exhibit a greater showing of support to remain on the ballot than that party needed to place a candidate in the first place and that are roughly comparable in magnitude to the tiers that North Carolina has established. See Libertarian Party of Virginia v. Davis, 766 F.2d 865 (4th Cir.1985) (.5% access requirement for statewide office, 10% retention); Socialist Workers Party v. Hechler, 696 F.Supp. 190 (S.D.W.Va.1988), aff'd in part, 890 F.2d 1303 (4th Cir.1989), cert. denied, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990) (1% access, 10% retention). Other circuits have upheld two-tier schemes that are more onerous. See, e.g., Arutunoff v. Oklahoma State Election Bd., 687 F.2d 1375 (10th Cir.1982) (5% access, 10% retention); Patriot Party of Pennsylvania v. Mitchell, 826 F.Supp. 926, 937 (E.D.Pa.), aff'd, 9 F.3d 1540 (3d Cir.1993) (2% access, 15% retention); see also Libertarian Party of Maine v. Diamond, 992 F.2d 365 (1st Cir.1993).
 
 
 23
 We cannot dispose of this issue, however, simply by noting that schemes with similar tiers have been uniformly upheld. The Supreme Court has emphasized that ballot access restrictions must be assessed as a complex whole. Because it is rare indeed that a rule which requires a party to demonstrate a particular percentage of support in order to secure or retain ballot access would be unconstitutional per se,[8] a reviewing court must determine whether "the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights." Williams v. Rhodes, supra, 393 U.S. at 34, 89 S.Ct. at 12. Thus, in Jenness itself, the Court upheld Georgia's two-tier system only after demonstrating that other aspects of the election laws served to ensure reasonably open access to the ballot. The Court stressed, for example, that the law imposed no obstacle to the counting of write-in votes and "no suffocating restrictions whatever upon the free circulation of nominating petitions." 403 U.S. at 438, 91 S.Ct. at 1974. And in Burdick, the Court upheld Hawaii's ban on write-in voting in light of the ease with which unaffiliated and small party candidates could get their names placed on the ballots in that state's "open primary." The Court concluded that "Hawaii's prohibition on write-in voting, considered as part of an electoral scheme that provides constitutionally sufficient ballot access, does not impose an unconstitutional burden upon the First and Fourteenth rights of the State's voters." 504 U.S. at 441-42, 112 S.Ct. at 2067-68. See also Storer v. Brown, supra, 415 U.S. at 737, 94 S.Ct. at 1282 (noting that "a number of facially valid election laws may operate in tandem to produce impermissible barriers to constitutional rights").
 
 
 24
 When the ballot access provision here at issue is assessed in light of the totality of North Carolina's election laws, a serious problem is raised that has to be addressed. In one potentially significant respect, the North Carolina ballot access regime is distinguishable from, and more restrictive than, the Georgia system that the Supreme Court upheld in Jenness, and the West Virginia and Virginia schemes that we approved in Hechler and Davis, respectively. Specifically, North Carolina provides no means by which a small party can nominate a candidate for any office in the state unless it secures the petition support of 2% of the persons who voted in the previous gubernatorial election. That means, for instance, that the Libertarian Party cannot nominate candidates even in the four legislative districts where Libertarian candidates polled more than 10% of the total vote cast at the 1992 election without first meeting the requirements to qualify as a statewide party. Even had a Libertarian candidate for local or countywide office won her election, her ability to designate her party affiliation on the ballot for purposes of reelection would be conditioned on the party's ability to register support elsewhere. (She could, of course, run for reelection as an independent candidate. But she would then be obligated to identify herself as "unaffiliated" on her ballot access petition, N.C. Gen.Stat. Sec. 163-22(b), and, if her petition succeeded, would appear on the general election in the column headed "Unaffiliated Candidates." Sec. 163-140.) More generally, no party other than the Democrats and the Republicans can run a candidate in any election in the state in 1996 unless it submits a petition with 51,904 voters across the state (including at least 200 in each of four congressional districts)--even if that far exceeds the number of persons registered to vote for that office.
 
 
 25
 Under the Georgia law upheld in Jenness, in contrast, a nominee of any political body, or an unaffiliated candidate, could get his name placed on the general election ballot by filing a petition "signed by a number of electors of not less than five per cent. of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking." Jenness, 403 U.S. at 433, 91 S.Ct. at 1971-72 (internal quotation omitted). Significantly, Georgia law provided for the identification of a candidate's minor-party (i.e., "political body") affiliation, if any, on both the nominating petition, Ga.Code Ann. Sec. 34-1010(d) (1970 rev.), and the general election ballot. Sec. 34-1103(c). Likewise, under the West Virginia law at issue in Hechler, a petitioner seeking any office was permitted to designate her minor-party affiliation on the nominating petition and, if she obtained a spot on the general election ballot by submitting the signatures of voters numbering 1% of the votes cast at the previous election for the office sought, see Hechler, 890 F.2d at 1307, she could designate her party affiliation on the official ballot as well. W. Va.Code Sec. 3-5-23(d) (1989). And, the Virginia ballot access laws at issue in Davis imposed only modest petitioning requirements for independent candidates and candidates affiliated with unrecognized parties in races for less-than-statewide offices. See Va.Code Ann. Sec. 24.1-168 (1985) (recodified, as amended, at Sec. 24.2-506). Although Virginia prohibited the name of any political party--major or minor--to be listed on the general election ballot, Va.Code Ann. Sec. 24.1-111 (1985) (recodified, as amended, at Sec. 24.2-613), the statute was silent as to whether party affiliation could appear on the nominating petitions.
 
 
 26
 As indicated, this is a serious distinction that arguably could make a constitutional difference. Noting that it had long recognized "the constitutional right of citizens to create and develop new parties," the Supreme Court cautioned in Norman that it may be impermissible for a state to "foreclose the development of any political party lacking the resources to run a statewide campaign." Norman, 502 U.S. at 289, 112 S.Ct. at 705-06. Arguably, that is the combined effect of the North Carolina ballot access restrictions we have identified.[9] By directing that a political party cannot run a candidate for election to any office in the state unless it garners the petition support of 2% of the electorate or the votes of 10%, sections 163-96 and 163-97 have combined so far to ensure that the Libertarian Party (and potentially any other small party) has been forced to expend great effort to obtain statewide and local ballot access before each gubernatorial and presidential election only to lose that access in toto immediately thereafter.
 
 
 27
 The fact that unaffiliated candidates can be placed on the ballot for local, district, and county offices by submitting a petition with signatures from 4% of the registered voters in that area, see supra note 2, does not necessarily relieve the problem. The Supreme Court has recognized that "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." Storer, 415 U.S. at 745, 94 S.Ct. at 1286. Cf. Eu, 489 U.S. at 224-25, 109 S.Ct. at 1021 ("imposing limitations 'on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association' ") (quoting Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 296, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981)). By permitting independent candidates for local office to gain ballot access by showing a substantial modicum of support among voters in the relevant community while withholding that option from affiliated candidates of small parties, the state inevitably burdens the associational rights of members of those small parties as well as the informational interests of all voters regardless of their party affiliation. See Tashjian, 479 U.S. at 220, 107 S.Ct. at 552 ("To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise."). As the Eighth Circuit noted when striking down a North Dakota ballot access regime which provided a shorter filing period for affiliated candidates than for independents, "[a] candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process." McLain, supra, 637 F.2d at 1165; see also Libertarian Party of South Dakota v. Kundert, 579 F.Supp. 735, 739 (D.S.D.1984).
 
 
 28
 The problem's seriousness conceded, we nevertheless believe that the provisions at issue pass constitutional muster under the Supreme Court's decision in American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). There, the Court upheld a two-tier system that did not provide a separate avenue for small parties to run candidates for local elections.[10] In the Texas scheme, as in the North Carolina one here at issue, an independent candidate for local office could place her name on the ballot by securing signatures from voters representing a fixed percentage of the votes cast in that district, see id. at 775 n. 7, 94 S.Ct. at 1303 n. 7; a party, in contrast, could not nominate candidates for local office without demonstrating statewide support.[11] Other courts of appeals have similarly upheld two-tier systems that do not provide a mechanism for a party to achieve ballot access for local or county elections without having to demonstrate significant statewide support. See Libertarian Party of Florida v. State of Florida, 710 F.2d 790, 795 (11th Cir.1983) (dismissing a constitutional challenge to election laws which provided, inter alia, that "a minor political party may not run a candidate in a local election without first obtaining access to the state's general election ballot through the 3% statewide petitioning requirement"); Arutunoff v. Oklahoma State Election Bd., 687 F.2d 1375 (10th Cir.1982).
 
 
 29
 Although subsequent Supreme Court opinions might be read to cast some doubt upon the constitutionality of the election scheme upheld in White, see, e.g., Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) (observing in dicta that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office ") (emphasis added)--and thereby to discredit Libertarian Party of Florida and Arutunoff --we feel bound to treat the result in White as controlling unless and until the Supreme Court provides a much clearer signal to the contrary. For that reason, we reject the Libertarians' challenge to North Carolina's election laws restricting political party access to the ballot. Although the challenge is a serious one, we agree with the district court that the ballot access rules do not unconstitutionally burden rights guaranteed by the First and Fourteenth Amendments.
 
 B.
 
 30
 We next consider the challenge to the mandated ballot-petition language.
 
 
 31
 Properly understood, a state law that regulates the specific form and content of ballot access petitions is itself a ballot access regulation. The extent to which any prescribed language encourages or deters persons from signing the petition makes it correspondingly easier or harder for the petitioning party to garner the requisite number of signatures to gain ballot access. North Carolina mandates that:
 
 
 32
 Petitions for the creation of a new political party shall contain on the heading of each page of the petition in bold print or all in capital letters the words: "THE UNDERSIGNED REGISTERED VOTERS ... HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY TO BE NAMED_____ .... THE SIGNERS OF THIS PETITION INTEND TO ORGANIZE A NEW POLITICAL PARTY TO PARTICIPATE IN THE NEXT SUCCEEDING GENERAL ELECTION."
 
 
 33
 N.C. Gen.Stat. Sec. 163-96(b). The Libertarians object to the mandated language on two grounds. They argue that it conveys the erroneous impressions, first, that the Libertarian Party is "new" in the colloquial sense and, second, that each petitioner will have to assume an active role in forming the Party beyond merely signing the petition. For purposes of the Anderson balancing test, the plaintiffs' contention is that the challenged language impedes the Party's ability to get on the ballot without advancing any legitimate state interests.
 
 
 34
 The district court acknowledged that the challenged language "could possibly cause some minor confusion in that voters may think that the party seeking ballot access has no previous existence and/or that they are personally required to do some organizing." 850 F.Supp. at 393. It apparently also recognized that the state had no legitimate interest in inducing either belief among potential signatories. The court nonetheless rejected the plaintiffs' constitutional challenge on the grounds that they had failed to prove that the language did in fact cause any confusion which harmed the Party's petition drive in the least. The court emphasized that its holding "would not foreclose a challenge to the petition language in the future upon presentation of sufficient evidentiary support." Id.
 
 
 35
 Initially, we agree with the district court that the state can have no legitimate interest in requiring signers to commit to being party organizers. As the Supreme Court has expressly recognized, "[a] major state political party necessarily includes individuals playing a broad spectrum of roles in the organization's activities. Some of the Party's members ... limit their participation to casting their votes for some or all of the Party's candidates." Tashjian, 479 U.S. at 215, 107 S.Ct. at 549. BOE's contention that the language in question serves "legitimate and compelling state interests" by "assur[ing] election officials that it will not be a waste of money to print the new party's candidates' names on the ballot," BOE Brief, at 15, is without merit. While the final sentence of the mandated language can no doubt help election officials gauge the intensity of the party's support insofar as it may prevent less committed supporters of a new party from signing the ballot access petition, the state has no legitimate interest in limiting ballot access to parties which show a substantial modicum of enthusiastic support. Because every vote counts the same, whether cast enthusiastically or even grudgingly, cf. Dixon v. Maryland State Admin. Bd. of Election Laws, 878 F.2d 776, 782 (4th Cir.1989) (discussing the considerable significance of "protest votes" in the democratic process), the relevant question for purposes of ballot access can only be whether members of the public want to have the opportunity to vote for a candidate of a particular party. See Libertarian Party of Nevada v. Swackhamer, 638 F.Supp. 565, 569 (D.Nev.1986); Kundert, supra, 579 F.Supp. at 739 (citing with approval mandated petition language in Minnesota, Montana, Colorado, North Dakota, Florida, and Texas). The number of persons who are sufficiently committed to the party to help organize it is simply not pertinent.
 
 
 36
 Although the particular language that North Carolina prescribes on ballot access petitions does not advance any important state interests, it fails the Anderson balancing test only if it also does in fact burden protected rights. In the absence of any evidence that the challenged language has made it any more difficult for the Libertarians to secure petition signatures than their task would have been had their petitions omitted the objectionable references, the dispositive question is whether, as the Libertarians urge, we should simply assume that the challenged language does hamper small parties' efforts to attract voters to sign their petitions. We are certain that a court should indulge such an assumption in appropriate cases. Thus, in Hechler, we invalidated a West Virginia ballot access provision which required that nominating certificates declare that each signator "desires to vote" for the named candidate because we concluded that "there can be only one interpretation of this language in the mind of a subscriber:" that he intends to vote for the candidate in the general election. 890 F.2d at 1308. Emphasizing that what was important was how voters would interpret the petition language, not what the legislature intended, id. at 1310, we held the statutory requirement unconstitutional at least in part because it was clear to us that such an interpretation would "discourage people from joining unpopular or controversial parties or causes." Id. at 1309. See also Anderson v. Mills, 664 F.2d 600, 608-10 (6th Cir.1981). We cannot say of the challenged language in this case, however, that it permits of "only one interpretation." While we agree that the language "could possibly" be interpreted the way the Libertarians claim, we are equally certain that it need not be so interpreted. A reasonable voter could well construe the language as a whole to mean only that the signers intend jointly--and not necessarily severally--to organize a political party that is "new" in the narrowly relevant sense of not being presently qualified "to participate in the next succeeding general election." So understood, the language is not likely to deter a person otherwise interested in supporting a petitioning party from contributing her signature.
 
 
 37
 At bottom, we believe that we may not declare a state's mandatory ballot petition language unconstitutional merely because it could conceivably mislead some individuals and could have been crafted more adroitly. Rather, either the factfinder must be persuaded that protected expressive, political, and associational rights have in fact been invaded, or the court must be able to conclude as a matter of law that such is the inevitable consequence. Because neither condition is here satisfied, the district court properly refused to declare N.C. Gen.Stat. Sec. 163-96(b) unconstitutional on the stipulated record before it.[12]
 
 C.
 
 38
 We consider finally, the challenge to N.C. Gen.Stat. Sec. 163-97.1, which mandates disaffiliation of a party's registered voters when the party "ceases to exist" by operation of Sec. 163-97. Although the Libertarians claim that this forced disaffiliation requirement burdens their protected rights in a myriad of ways, we believe that the arguable burdens reduce to two. The first is that claimed to result from the forced changing of the registration of all their members to "unaffiliated" status; this, it is argued, prevents the party from benefitting from the state's extensive efforts to update and classify the voter registration lists. See N.C. Gen.Stat. Secs. 163-65 to -74. The second is the burden claimed to be imposed upon those parties which, like the Libertarian, remain in existence after losing ballot access status and eventually regain official recognition by preventing them from exploiting the natural inertial force of registration as the established parties can. Instead, such parties are compelled to expend some portion of the limited resources which they can possibly devote to voter registration efforts simply to re-register former party members who had been forcibly disaffiliated. This is a real harm, the Libertarians claim, because real benefits accrue to a party in proportion to the number of its registered voters. Most notably, recognized parties are entitled to disbursements from the North Carolina Political Parties Financing Fund "on a pro rata basis according to their respective party voter registrations." N.C. Gen.Stat. Sec. 105-159.1. Also, the more favorable ballot positions are reserved for those parties which have affiliated at least 5% of the total number of registered voters.
 
 
 39
 We believe that the plaintiffs' first argument is without merit, for disaffiliated parties still have access to the state's registration lists (albeit for a fee) even after they lose official recognition. Therefore, the Libertarians are able to gain as much information from the updated lists as can the established parties so long as they take the simple expedient of recording all voters who have registered "Libertarian" before those voters' affiliation is changed. We do agree, though, with the plaintiffs' second argument. While the burden is no doubt small, it is real and cognizable.
 
 
 40
 In opposition to this burden, BOE argues that Sec. 163-97.1 "meets legitimate state goals of fostering administrative simplicity (no need to maintain information about a party that no longer exists) and maintaining the integrity of the elections process by having the registration records reflect the true state of affairs." BOE Brief, at 9. In order to perform the Anderson balancing test, we will consider the validity and gravity of each alleged state interest.
 
 
 41
 BOE's second contention--the "electoral integrity" argument--rests on a fallacious premise. "[T]he true state of affairs," as far as we can tell, must be that a party continues to exist so long as it retains enough of the features that ordinarily serve to constitute a voluntary association of persons: chiefly membership, a name, and a purpose. By these ordinary tokens of existence, and as far as the record reveals, the state Libertarian Party has existed continuously since its formation in 1976. In short, the Libertarian Party has not, as BOE's argument would suggest, risen like a Phoenix from its own ashes every four years. Accordingly, we cannot perceive how electoral integrity would be disserved by permitting affiliates of a political party that strives mightily (and usually successfully) to place candidates on the general election ballot at regular intervals to retain their party registration during the interim periods when the party's purported nonexistence is entirely formal. We especially observe that "electoral 'integrity' does not operate as an all-purpose justification flexible enough to embrace any burden, malleable enough to fit any challenge and strong enough to support any restriction." Republican Party of Arkansas v. Faulkner County, Arkansas, 49 F.3d 1289, 1299 (8th Cir.1995).
 
 
 42
 In contrast to its "electoral integrity" argument, BOE's first contention--the "administrative simplicity" argument--does have some force. True, the conclusory parenthetical "(no need to maintain information about a party that no longer exists)" is as weak as is BOE's contentions regarding the "true state of affairs." Nonetheless, we believe that the district court was right to observe
 
 
 43
 that if all political parties, no matter how small, had a right to have voters list themselves as being affiliated with them, the list could become sizeable; thereby posing possible administrative burdens and also causing confusion for registrars, such as trying to keep track of parties whose names are similar.
 
 
 44
 850 F.Supp. at 386.[13] The district court noted that the administrative burden is not great but, given the very limited burden that the disaffiliation provision imposes, it need not be.
 
 
 45
 We agree. We therefore conclude that the state's interests in administrative simplicity that are advanced by the forced voter disaffiliation provision, N.C. Gen.Stat. Sec. 163-97.1, outweigh the small burden that provision imposes upon affected parties' associational interests.
 
 III.
 
 46
 For the foregoing reasons, we hold that the challenged provisions of the North Carolina election laws do not violate the appellants' rights under the First and Fourteenth Amendments. The district court's judgment is
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 The statute also provides for the counting of votes cast for write-in candidates upon the filing of a petition with 500 verified signatures (if the candidate is running for a state-wide office) and the payment of a verification fee of $.05 per signature. N.C. Gen.Stat. Sec. 163-123 (1994)
 
 
 [2]
 To qualify as an unaffiliated nominee for statewide office, the candidate must procure signatures from 2% of the state's registered voters. To qualify as an unaffiliated nominee for election to a county or district, the candidate must garner signatures from 4% of the registered voters in the relevant geographic area. In either event, the candidate must pay a $.05 verification fee to the state Board of Elections for each signature. N.C. Gen.Stat. Sec. 163-122. Also, pursuant to the so-called "sore loser provision," a person whose name appeared on the primary election ballot of any party is ineligible to be listed as an unaffiliated candidate. Id. A candidate nominated through the individual petition process will be listed on the ballot in the column headed "Unaffiliated Candidates." N.C. Gen.Stat. Sec. 163-140(b). There is no provision enabling such a candidate to identify her party affiliation, if she has one
 The provisions for qualification as an unaffiliated candidate are not directly at issue in this action.
 
 
 [3]
 In North Carolina, the four-year gubernatorial election cycle coincides with the presidential election cycle
 
 
 [4]
 The election laws term such a party a "political party" simpliciter and distinguish parties that secure ballot access via petition by labelling the latter "new" political parties. Sec. 163-96
 
 
 [5]
 At that time, North Carolina required a party to obtain 10,000 signatures in order to qualify as a new party. See N.C. Gen.Stat. Sec. 163-96 (1976). The law was amended in 1981 to require 5000 signatures and added the proviso that at least 200 signatures must be obtained from each of four congressional districts. 1981 N.C. Sess. Laws ch. 219. The law was amended to its present form in 1983. 1983 N.C. Sess. Laws ch. 576, Sec. 3
 
 
 [6]
 As an apparent corollary to the rule that election regulations that impose severe burdens on protected interests are subject to strict scrutiny, some courts have discerned or suggested that election laws that impose less substantial burdens need pass only rational basis review. See, e.g., Fulani v. Krivanek, 973 F.2d 1539, 1543 (11th Cir.1992); McLain v. Meier, 637 F.2d 1159, 1167 & 1168 n. 16 (8th Cir.1980). We do not read the Supreme Court's opinions that way. We believe that a regulation which imposes only moderate burdens could well fail the Anderson balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational. See, e.g., Burdick, 504 U.S. at 439-40, 112 S.Ct. at 2066-67 (determining, first, that challenged election provision imposed "slight" burden and then applying balancing test to conclude that the "legitimate interests asserted by the State are sufficient to outweigh the limited burden"). On the other hand, if a regulation imposes no burdens, it would not fail the balancing test even though it also served no discernible state interest. See infra Section II.B
 
 
 [7]
 On this point, we disagree with the district court which, in finding that the ballot access regulations did not impose a severe burden on protected interests (and therefore did not warrant strict scrutiny), might have thought that such regulations do not impose a "severe" burden unless they are exclusionary. See, 850 F.Supp. at 382. To the contrary, as we previously have observed, strict scrutiny can apply to laws which "mak[e] it difficult, but not impossible, for a new political party to obtain a position on the ballot." Greidinger v. Davis, 988 F.2d 1344, 1352 (4th Cir.1993) (citing Norman ); see generally id. at 1349-52
 
 
 [8]
 Such a rare instance might arise, for example, were a provision to terminate a party's ballot access upon its failure to poll at least 35% of the vote. In that case, the election laws would effectively ensure that no more than two parties could ever become "established."
 
 
 [9]
 It should be noted, however, that another related restriction on small party access recently has been voided. N.C. Gen.Stat. Sec. 163-98, which provides that "new" parties can "have the names of its candidates for State, congressional, and national offices printed on the official ballots, but it shall not be entitled to have the names of candidates for other offices printed on State, district, or county ballots at that election" was declared unconstitutional in New Alliance Party v. North Carolina State Bd. of Elections, 697 F.Supp. 904 (E.D.N.C.1988)
 
 
 [10]
 Although the plaintiffs in White did not directly challenge Texas's failure to provide a less onerous means for affiliated candidates of small parties to run for local office, the absence of any such alternative was clear from the record and the Court expressly held that the state's ballot access limitations, "whether considered alone or in combination, are constitutionally valid." 415 U.S. at 781, 94 S.Ct. at 1306. Accordingly, we have previously recognized that the White Court held the Texas ballot access scheme, "taken as a whole, to be within the bounds of the Constitution." Hechler, 890 F.2d at 1306 (emphasis added)
 
 
 [11]
 That the access and retention percentages under Texas law were 1% and 2% respectively (rather than 2% and 10%) does not suffice to make White distinguishable from this case. First of all, what makes the North Carolina ballot access laws potentially suspect under our analysis is that they use statewide, rather than more localized, voting figures as the benchmark for determining whether a party has a sufficient modicum of voter support. In that regard, the Texas and North Carolina are indistinguishable. Moreover, it is certainly possible that, given all its peculiarities, the Texas scheme may have made it more difficult than does the North Carolina scheme for small parties to gain ballot access. For example, a Texan voter was ineligible to sign a nominating petition if he had already signed a nominating petition for another party or had voted in a party primary. See 415 U.S. at 774 n. 6, 94 S.Ct. at 1303 n. 6
 
 
 [12]
 We reiterate that the Libertarians did not proffer any evidence that the challenged aspects of the mandated petition language actually hampered their petition drive in even the slightest degree. Consequently, we need not determine whether the district court's observation that the plaintiffs had "not presented sufficient facts ... to show that numerous voters would have signed the petition had it not been for the allegedly offending language," 850 F.Supp. at 393 (emphasis added), impliedly overstated the proper extent of the plaintiffs' evidentiary burden
 
 
 [13]
 The district court also adverted to a third interest not advanced by the defendants, in noting that, absent forced disaffiliation,
 [t]he voters could suffer prejudice as well. Being affiliated with a major party or being unaffiliated allows voters the possibility of voting in the primary elections. N.C. Gen.Stat. Sec. 163-59. If numerous small groups were given affiliation rights, this would shut out those voters from the primary process, thereby possibly increasing the feeling of alienation and disenfranchisement. The dangers of factionalism, confusion, and over-reaching would be significantly increased.
 
 
 [850]
 F.Supp. at 386-87
 There is no doubt, of course, that the state has a legitimate and important interest in combatting feelings of alienation among the electorate. Unlike the district court, however, we cannot discern how the challenged provision advances that interest. Indeed, we consider it nothing short of fantastic to suppose that people who have taken the affirmative steps to register with a particular party must be forcibly disaffiliated because the alternative--maintaining the status quo until the voter him or herself chooses to change his or her affiliation--would breed a sense of disenfranchisement. The 677 adults who, like plaintiff Kathleen Ferrell, registered as Libertarians are not likely to feel disenfranchised because they are unable to vote in the primaries of the established parties.